Juan S. RUEDA, Plaintiff, Appellee,

v.

SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO, and Seafarers Welfare & Pension Plan, Defendants, Appellants.

No. 77–1423.

United States Court of Appeals, First Circuit.

Argued Feb. 14, 1978.

Decided May 16, 1978.

Carolyn Gentile, Brooklyn, N.Y., for defendants-appellants.

Charles A. Cuprill-Hernandez, Ponce, P.R., for plaintiff-appellee.

Before COFFIN, Chief Judge, MOORE,[**] Senior Circuit Judge, and BOWNES, Circuit Judge.

COFFIN, Chief Judge.

Appellee, a merchant seaman, brought a diversity action in district court against the pension plan of the union to which he belonged, challenging the trustees' denial of his application for a permanent disability pension. The district court found for the seaman, and this appeal followed. At issue is whether the trustees' interpretation of the pension eligibility requirement is arbitrary and capricious.

The Seafarers Pension Plan (SPP)[1] was established as part of a collective bargaining agreement between signatory employers and labor unions affiliated with the Seafarers International Union of North America. By the terms of the agreement, a board of trustees appointed by labor and management is authorized to formulate and administer a pension plan.

Article 1, Section 4 of the regulations promulgated by the trustees is entitled "Eligibility for a Disability Pension".[2] It provides that an employee who has become totally and permanently disabled shall be entitled to retire on a disability pension if two requirements are fulfilled. First, the employee must have at least 4,880 days of "covered employment". Second, 90 days of the employment must have accumulated during the calendar year prior to the application, and one day of it during the preceding six months. For convenience, we shall refer to the former as the "total" requirement and to the latter as the "recency" requirement. Article 1, Section 2, paragraph 10 defines the term "covered employment" as employment for which the employer is obligated to make contributions to the fund in behalf of the employee, and "periods of disability to the extent specified in the Regulations."[3] A third regulation, Article 11, Section 2b, entitled "Eligibility Extension", sets forth a complex provision governing both the extension and termination of eligibility under certain conditions.[4] The proper interpretation of this regulation is the substance of the issue on appeal.

---

[**] Of the Second Circuit, sitting by designation.

1. Appellee originally filed an action against the Seafarers Welfare and Pension Plan (SWPP), a separate jointly administered labor-management trust created pursuant to 29 U.S.C. § 186 as part of a collective bargaining agreement with the Seafarers International Union of North America, A.F.L.–C.I.O. By leave of court he amended his complaint to include the Seafarers Pension Plan, and ultimately proceeded against that defendant only.

2. "Article 1, Section 4. *Eligibility for a Disability Pension.*

An employee shall be entitled to retire on a Disability Pension if he becomes totally and permanently disabled provided he has pension credits for at least 4,380 days of covered employment (12 years) and, provided further, he has accumulated at least 90 days of covered employment during the calendar year preceding his date of application and at least one (1) day of employment during the six months period immediately preceding such application."

3. "Article 1, Section 2—paragraph 10. *Covered Employment.*

'Covered Employment' means employment for which the Employer is obligated to contribute to the Seafarers Welfare Plan, and for the purpose of eligibility shall include periods of time preceding the date when the Employer became so obligated, periods of disability to the extent specified in the Regulations, and periods during which employees participate in the Upgrading and Certifications Programs of the Maritime Advancement Programs, and/or the Harry Lundeberg School of Seamanship and its successor; . . . ."

4. "Article 11, Section 2b. *Eligibility Extension.*

1. All covered employees possessing the eligibility requirement of 90 days of covered employment during the last calendar year and one day of covered employment within the past six months incident to the receipt of S & A In-Out Patient or In-Hospital Benefits from the Seafarers Welfare Plan and/or Maintenance and Cure from a Signatory Employer, such eligibility will be preserved and extended by each unrelated illness or injury for up to a maximum of 39 weeks for other benefits under the plan with termination of eligibility after expiration of the maximum period specified, or when next found

The question here is whether the seaman fulfilled both the total and the recency portions of the eligibility requirement for a permanent disability pension. It is undisputed that between 1945 and May 18, 1967 he accumulated 3,704 working days. As a result of a job related injury incurred on May 18, 1967, he received temporary disability benefits from May 20, 1967 through April 8, 1970, a total of 1,110 days. On September 17, 1970 he was pronounced permanently disabled and on the same date applied to SPP for a disability pension.[5]

Both parties agreed that the number of days the seaman had worked added to the number of days during which he had received benefits on account of his injury was 4,814, or more than the 4,380 days needed to fulfill the first part of the eligibility requirement. The seaman claimed that the second part was also fulfilled, in that the required 90 days of covered employment within the year prior to the application fell during the 1,110 days for which he received

temporary disability benefits, as did the necessary one day within the preceding six months.[6] That point the trustees disputed. They maintained that although time covered by temporary benefits could be added to working days for the purpose of accumulating the requisite 4,380 days, it could not count toward the additional requirement of covered employment within the one year period and six month period immediately preceding the application. Under their interpretation, receipt of the first temporary disability benefit triggered the "Eligibility Extension", which preserved disability time as covered employment for 39 weeks, until February 16, 1968, with the result that the last day when appellee would have one day of covered employment in the prior six months would be August 16, 1968. Since the seaman had not applied for the pension until September 17, 1970, he did not have the number of days within six months and one year of his application required by the rule.[7]

to be fit for duty, whichever the earlier with the implicit understanding that periods of receipt of S & A In-Out Patient or In-Hospital Benefits from the Seafarers Welfare Plan, as well as Maintenance and Cure from the Signatory Employer, will continue to accrue and be credited towards pensions and Special Disability Benefits pursuant to the Rules (Disability for a period during which Disability or In-Hospital Benefits were paid under the Seafarers Welfare Plan, to the extent of ½ of an applicant's seatime, but not in excess of ⅓ of the total requirement), with the same rules applicable to periods of Maintenance and Cure from Signatory Employers, and that the receipt of S & A In-Out Patient and In-Hospital Benefits does not extend eligibility for S & A In-Out Patient and In-Hospital Benefits."

5. The record reveals only that after three years of receipt of temporary disability benefits, a Public Health doctor pronounced appellee permanently unfit for duty on September 17, 1970. The only information given as to appellee's condition is that after a fall on May 18, 1967, appellee suffered low back pain and pain and numbness over the buttocks, perineum and right leg. The brief descriptive passage in the clinical record closes as follows: "Treatment had been conservative since the operation in 1967, with no success. Patient refuses further operations."

6. A schematic diagram of appellee's computation is as follows:

RECENCY REQUIREMENT MET

7. A schematic diagram of the trustee's computation is as follows:

RECENCY REQUIREMENT NOT MET

The district court, after submission of affidavits, answers to interrogatories and requests for admissions, and a stipulation, arrived at two relevant conclusions. First, it reasoned that the first part of Article 11, Section 2b, *see* n. 3, did not apply to this case, because "provisions for extension of benefits become relevant only if the employee's eligibility would otherwise be lost" and plaintiff was making no such claim. Second, this part of the section no longer being in the case, the court had no difficulty in concluding that since plaintiff had received disability payments from May 20, 1967 to April 8, 1970, he had not only sufficient days of covered employment to meet the total requirements but met the 90 days in one year and one day in six months requirements as well. Implicit in the court's conclusions is the assumption that any time creditable toward the total requirement is creditable toward the recency requirement.

 We begin our task with the recognition, shared by the parties, that unless the trustees' interpretation of the plan is arbitrary and capricious, or without rational basis, it may not be disregarded. *Johnson v. Botica,* 537 F.2d 930, 935 (7th Cir. 1976); *Gomez v. Lewis,* 414 F.2d 1312, 1314 (3d Cir. 1969); *Miniard v. Lewis,* 128 U.S.App.D.C. 299, 387 F.2d 864, 865 (1967). We also must realize that we review for arbitrariness in the light of the trustees' responsibility to all potential beneficiaries. *Gaydosh v. Lewis,* 133 U.S.App.D.C. 274, 410 F.2d 262 (1969). This duty in the large, the necessity to draw hard boundary lines, inevitably adversely affects some individuals who find themselves on the wrong side of a line. *Johnson, supra; Gomez, supra.*

 In the present case the most appealing argument supporting appellee is that under the trustees' interpretation, appellee was in a Catch 22 plight: he had not been found totally and permanently disabled by the time he should have applied for his pension; yet by waiting until found dis-abled he was time barred from qualifying. While it may well be that appellee could have earlier filed a protective application or, for that matter, knew full well what his long run prognosis was, such speculations do not change the basic impact of the trustees' policy. Any recency requirement will inevitably result in some seamen exhausting their eligibility before they can conscientiously apply for a disability pension.

Given the standard of review which applies to this case, we must inquire whether, notwithstanding the injustices which may befall individuals, the scheme as viewed by the trustees is a rational one for SPP as a whole. The trustees argue that under their interpretation of the "Eligibility Extension" regulation, a worker has fifteen months of a consecutive "temporary" disability before he loses his "recency" eligibility (the 39 week—or 9 month—period of receipt of benefits which is treated as "covered employment" plus a further period of six months which includes the last day of the 39 week period). This, they say, insures that the great majority will be able to apply for a disability pension before their eligibility expires.

The trustees then point to the underlying rationale of the cut-off or recency requirement and the different treatment of disability time, allowing all such time to count for the total days requirement but limiting such time to fifteen months in determining whether the recency requirement has been met. The affidavits submitted by and for the trustees asserted that the financial feasibility and integrity of the SPP depended upon the trustees' ability at any reporting or planning date to know the number of individuals as to whom SPP had potential liability. With this number fixed, a total liability figure could be estimated, a contribution rate and funding standard established, and a proper reserve set aside and invested at short term rates to insure its liquidity. If no such device were used, it is claimed that potential demands would be more open-ended, resulting in allocating more reserve to be invested at less produc-

tive, short term rates, resulting in diminished fund availability.[8] While thus supporting the concept of an eligibility cut-off, the trustees point to their more liberal approach to the total service requirement. All disability time is counted for this purpose, they say, in order to enable workers to avoid a break-in-service.

We need not be convinced that the trustees' approach is the only or the best way to plan and maintain the integrity of the fund. We need only be convinced that it is a rational one and is supported by a reasonable reading of the regulations. We cannot say the trustees' reasoning is irrational. Nor can we say it is without basis in the regulations.

Article 1, Section 2, paragraph 10 begins by defining "covered employment" as including both working time and "periods of disability to the extent specified in the Regulations." We note that if, as appellee argues, there was no limitation for eligibility purposes on periods of disability, the last seven words in this phrase would be misleading surplusage. According to the trustees, Article 11, Section 2b proceeds to specify the situations in which disability time shall be credited for eligibility purposes. The function of this section, they urge, is to place pension eligibility limits on the time after a seaman has become injured or ill, when contributions from his employer have stopped.

Therefore the trustees construe the section's initial reference to "covered employ-

ees" and "covered employment" as meaning employees who were actually working at the time of injury or illness and had 90 days of work in the past year and one day of work in the past six months. When, by reason of the infliction of injury on such an eligible person, sickness and accident benefits or Maintenance and Cure are received, i. e., when meeting the stated requirements led to, were "directly and immediately related to",[9] or were "incident to" the receipt of disability benefits, the status of eligibility which existed at the time of accident or illness would be frozen for 39 weeks.[10] In short, it is this period of disability which can be considered "covered employment".[11] If, during this period, another separate illness or accident were suffered (e. g., an automobile accident), which could be the basis of additional benefits other than Sickness and Accident (e. g., hospitalization of one's wife), the period of eligibility for such other benefits would be 39 weeks. But, as the section makes clear, the receipt of Sickness and Accident benefits during a period does not extend eligibility for these benefits.

This reading seems to us generally, if not perfectly, consistent with and supported by the language of the section. In contrast, we have more ponderable difficulty with appellee's interpretations. To begin with, we cannot accept the district court's reasoning that the Eligibility Extension provision (Art. 11, Sect. 2b) has no applicability. The court stated that the provision becomes "relevant only if an employee's eligibility would otherwise be lost". But, as appellant

---

**8.** We note that appellee did not avail himself of the opportunity to file supplementary questions on the subject matter of the affidavits.

**9.** Webster's Third New International Dictionary (1966).

**10.** Alternatively, the section could be read as saying that if a seaman were, because of his actual employment time, eligible for S & A but suffered an "unrelated" illness or injury that made some other benefit appropriate, he could receive this benefit for 39 weeks. In other words, it does not appear that one must receive

S & A benefits before receiving some other benefit. Such a reading does not change our analysis or conclusions.

**11.** Since this 39 week period of receipt of disability is considered as covered employment a seaman receiving S & A retains his eligibility to apply for a disability pension for six months from the last day of the 39 week period. Hence the total time he has to obtain a determination of total and permanent incapacity for pension purposes is fifteen months.

points out, under the court's assumptions the provision would never be relevant, for an employee,[12] if receiving disability benefits, would, under the court's theory, never be in danger of losing eligibility, while an employee who is neither employed by a signatory employer nor receiving disability benefits, could not have his eligibility extended—either indefinitely or for 39 weeks.

A possible interpretation of the section is that it refers to employees who possess the 90 days and 1 day requirement by virtue of or "incident to" having received disability payments on these days. But under this interpretation there would be no need to recite the "implicit understanding" that periods of receiving disability payments would continue to accrue for the total time requirement. The insertion of this clause is most explicable on the assumption that there has been a limitation for some purposes of the effect of disability time. In any event, we cannot say that this interpretation is so obvious and compelling that the trustees were irrational in not adopting it.

Appellee's additional arguments seem to us to fall far short of demonstrating arbitrariness on the part of the trustees. We note in passing that he has stipulated as a fact that "For the purposes of [the 90 day and 1 day prerequisites for a disability pension], an employee receives credit for covered employment if he is disabled and receiving [disability benefits] up to a maximum of 39 weeks credit for any continuous period of disability." It is hard for us to see how appellee, having so stipulated, can claim that the trustees erred "[i]n only counting the first 273 days of plaintiff-appellee [sic] last period of temporary disability and excluding the remaining 780 days." Nothing, however, having been made of this stipulation in briefs or argument, we hesitate to place complete reliance on it.

Appellee argues that the eligibility extension section applies only to "other benefits" under the Plan, not to an application for a disability pension. The basis for this assertion is that no time limit can be placed on such applications, other than a period after total and permanent disability is determined. This argument we have dealt with in saying that it is rational to have cut-off times to fix the number of potential claimants against a fund. Appellee then asserts that the language specifying that disability time "will continue to accrue and be credited" up to one half of seatime or one third of total time and the language proscribing the use of disability time as a basis for extending eligibility for disability benefits "makes it clear that the 39 weeks limitation refers to benefits other than disability benefits and pensions in the event of unrelated illnesses or injuries." We cannot follow this assertion. Indeed, as we have noted, were the first part of Section 2b *not* to affect the counting of disability time for any purpose, as appellee contends, there would be no need for any "continue to accrue" language. And at the very least the language barring the use of disability time as a basis for further disability time argues against appellee's contention that such time counts without interruption for all pension purposes.

That this tortuous analysis is necessary illustrates that Section 2b is not well drawn. But appellee has not demonstrated that the trustees' interpretation is arbitrary or capricious.

*Reversed.*

---

12. In the context of this section we are discussing only an employee who has ceased working for a signatory employer.