Joseph R. PALINO, et al., Plaintiffs, Appellants,

v.

Edwin T. CASEY, et al., Defendants, Appellees.

No. 81–1310.

United States Court of Appeals, First Circuit.

Argued Sept. 18, 1981.

Decided Nov. 23, 1981.

Miriam Vock Sheehan, Boston, Mass., with whom Richard W. Renehan and Hill & Barlow, Boston, Mass., were on brief, for plaintiffs, appellants.

Arthur J. Flamm, Boston, Mass., with whom Flamm, Kaplan, Paven & Feinberg, Boston, Mass., were on brief, for defendants, appellees.

Before BOWNES and BREYER, Circuit Judges, and MURRAY,* Senior District Judge.

BREYER, Circuit Judge.

Following a restrictive change in the eligibility rules of an employee "health and welfare" fund, appellants were not allowed to renew a medical insurance policy which they had previously bought from the fund. They did not secure other insurance when their coverage under the fund expired. They thus had to pay personally for the medical costs associated with the birth of their child several months later. To recover those costs, they brought this action against the fund's trustees. They claim that the trustees failed to give them adequate notice of the eligibility amendment, thereby violating their fiduciary duty to the fund's participants. The district court rejected this claim, and we affirm.

I

The Boston and Eastern Massachusetts Carpenters Health and Welfare Fund (the "Fund") provides medical insurance coverage for employees whose employers contribute to the Fund under the terms of a collective bargaining agreement. The insurance coverage runs for periods of six months at a time. From the Fund's inception in 1955 until 1973, an employee was eligible for a six-month period of insurance only if he worked a specified number of hours in "covered employment"—employment for which his employer was contributing to the Fund—during a prior six-month qualifying period.[1]

---

* Of the District of Massachusetts, sitting by designation.

1. In an exception to this rule not relevant to this case, the Fund permitted employees to average their hours in "covered employment" over two qualifying periods. This enabled employees with low hours in the most recent qualifying period, but with high hours in the period before, to retain their insurance for at least six months beyond what the rule stated in text would allow.

In 1973, the Fund's Trustees liberalized the eligibility rules by adopting a "self-payment" provision. The provision was designed to cushion the impact on the Fund's beneficiaries of high unemployment in the construction industry. It enabled an employee whose eligibility would have terminated because he had not worked enough hours in the previous qualifying period to pay an appropriate premium[2] to the Fund himself, and thereby to continue his coverage for one additional six-month period. Thus, under the old eligibility rules, a carpenter who had worked less than the specified number of hours in "covered employment" during the first half of the year would not have been able to secure coverage under the Fund in the second half of the year.[3] Under the new rules, however, the employee was able to secure coverage through the second half of the year—though not beyond that period—simply by paying for it.

Economic hard times persisted in the construction industry longer than expected and the Trustees continued to expand the Fund's eligibility rules. Although a variety of approaches were tried, the general thrust of amendments throughout the mid-1970's was to enable employees to buy coverage for longer periods of time and with less regard to the number of hours worked during preceding qualifying periods. The last of the expansionary amendments took effect in October of 1977 and permitted employees to secure coverage under the Fund by self-payment for up to six consecutive six-month periods (following a period of coverage based on employer contributions) without working any hours in "covered employment."

Late in 1977, a booklet was sent to the Fund's participants which contained, among other things, the following description of the Fund's then effective self-payment provisions:

*Revisions in the Self-Payment Provisions*
Page 5 of the descriptive booklet issued in 1974 explains the original ruling on self-payment provisions. Since that time, it has been modified by the Board of Trustees as follows:

a. Beginning October 1, 1977, a member is allowed to buy in for six consecutive qualifying periods if he meets the requirements set out in the descriptive booklet on page 5.

At the time, appellant Palino was already insured under the Fund through March of 1978 on the basis of his previous work for contributing employers. For the six-month period beginning in April of 1978, however, Palino was unable to secure coverage based merely on "covered employment" because he had worked less than the requisite number of hours for contributing employers in the previous qualifying period. Palino therefore chose to buy coverage under the Fund's self-payment provisions for his wife and himself for the six months from April through September of 1978. By the end of that six-month period, Palino was again unable to secure coverage on the basis of "covered employment." He thus bought "self-payment" coverage for a second six-month period, from October of 1978 through March of 1979.

In December of 1978, the Trustees again revised the Fund's eligibility rules, but this time by restricting rather than by broadening them. Several reasons underlay the change. Economic conditions had improved in the construction industry, and it was easier for carpenters to find work. The Trustees had learned that the self-payment program was depleting the assets of the

---

2. The premium varied inversely with the number of hours actually worked in "covered employment." In effect, the employee had to make up the difference between the cost of his insurance and the amount paid on his behalf by contributing employers.

3. Eligibility and qualifying periods under the Fund were actually separated by periods of two months. Thus, an employee's hours of "covered employment" from January 1 to June 30 determined his eligibility for coverage *not* from July 1 to December 31 but from September 1 through February of the next year. Nothing of significance in this case turns on the two-month gap, and we have taken the liberty of discussing the Fund and how it works as if the gap did not exist.

Fund. Finally, some individuals participating in the self-payment program had become self-employed contractors who the Trustees feared were statutorily precluded from participating in the Fund at all. *See* note 6, *infra.* The Trustees therefore decided that, as of April 1, 1979, previously eligible employees who lacked the requisite number of hours in "covered employment" would be allowed to pay for only one, not six, extra six-month periods of insurance, much as employees had been allowed to do when the self-payment program was first conceived in 1973.

In March of 1979, the Palinos received a semi-annual statement of eligibility indicating that they would not be able to purchase coverage for the six-month period beginning April 1, 1979. No reason was given. Sometime around April 1, however, the Palinos also received an official notice from the Fund's Trustees explaining that the eligibility rules had been changed to permit the purchase of only a single six-month period of insurance. Palino immediately complained to the Trustees, but to no avail. He had already used up the single six-month self-contributory period to which he was entitled under the new rules, and the Trustees affirmed the decision not to allow him to buy additional coverage.

When Palino's coverage finally expired at the end of March, his wife was several months pregnant. By the time he was first notified of his ineligibility to renew his coverage through the Fund, Palino claims, he was not able to find alternative medical insurance to cover his wife's maternity costs. In fact, the Palinos were not insured when Mrs. Palino had her child in July, and they thus had to pay those costs themselves. The Palinos subsequently brought this suit against the Fund's Trustees, claiming that the manner in which they changed the eligi-

bility rules—and, accordingly, the refusal to allow the Palinos to renew their coverage in April of 1979—violated the fiduciary duty imposed on fund trustees by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* ("ERISA").[4]

## II

At the outset, it is important to understand that this case has not been argued on a theory of contract law. Appellants do not claim that the Fund was in any way contractually obligated to provide them coverage after March 31, 1979. While appellants point to language contained in the booklet distributed to Fund participants in November of 1977 which states that, as of October 1, 1977, "a member is allowed to buy in for six consecutive qualifying periods," this language simply sets forth the Fund's eligibility rules. It does not state that those rules will remain in effect indefinitely. It cannot be read as a promise that changes will not occur in the future; changes in eligibility rules occurred fairly often throughout the years preceding the change announced in the booklet itself. Appellants do not claim that the Trustees offered Fund participants a contractually binding option to renew their coverage for six periods.

What this case does involve is a claim premised on the law of trusts. ERISA imposes on trustees of funds such as the one at issue in this case a fiduciary duty to manage the fund with prudence and in the interest of the fund's participants and beneficiaries. *See* note 4, *supra.* Appellants claim that, in light of the eligibility rules in effect since 1977 and the description of those rules contained in the 1977 booklet, it was a violation of their fiduciary duty for the Trustees to refuse to renew appellants' coverage when it ran out in March 1979.

---

**4.** Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), provides that:

(a)(1) ... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:
(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;
(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

Specifically, appellants' arguments may be read to claim that the Trustees have breached their fiduciary obligations under ERISA in two ways: by reducing the number of self-payment periods available to Fund participants, and by doing so without giving earlier notice.[5]

In judging the actions taken by trustees in the course of managing an employee benefit plan, our inquiry is limited to determining whether the actions were arbitrary and capricious in light of the trustees' responsibility to all potential beneficiaries. *Rueda v. Seafarers International Union*, 576 F.2d 939, 942 (1st Cir. 1978); *Gaydosh v. Lewis*, 410 F.2d 262 (D.C.Cir.1969). Under this standard of review, we are compelled to reject any contention that the Trustees acted unlawfully in reducing the number of self-payment periods available to Fund participants. Courts have consistently recognized that trustees of funds such as the one at issue in this case must often modify a fund's operation in light of changing financial conditions and economic circumstances. And, in particular, they have allowed trustees broad discretion to change eligibility rules even where doing so has harmed workers with far more vested an interest in a rule's continuation than appellants have here. *See, e. g., Bridge Workers Local 111 v. Douglas*, 646 F.2d 1211 (7th Cir. 1981) (amendment deprived employees of medical benefits to which they would otherwise have been entitled by virtue of their previously accumulated hours of work for contributing employers); *Local 5, Sheet Metal Workers' International Association v. Mahoning & Trumbull County Building Trades Welfare Fund*, 541 F.2d 636 (6th Cir. 1976) (amendment resulted in loss of coverage based on employer prepayments and an employee's "hour bank"); *Gaydosh v. Lewis, supra* (retired coal miner denied pension on the basis of an eligibility restriction adopted after he retired but less than one year before he reached the age at which his pension rights would otherwise have fully matured). It is undisputed that the Trustees curtailed the Fund's self-payment program for three entirely legitimate reasons: work in the industry had become easier to find and the need for the program had thus diminished; the program had proved to be a financial drain on the Fund's assets; and the program had apparently come to include people who had left the employ of contributing employers indefinitely.[6] Given these concerns and the Trustees' obligation to preserve the viability of the Fund over time, we cannot say that their decision to curtail the Fund's self-payment program was arbitrary and capricious.

With respect to appellants' second, and principal, contention—that the Trustees failed to provide adequate notice of the eligibility amendment—we reach the same

---

5. In terms, appellants challenge only the Trustees' failure to provide earlier notice of their decision to amend the eligibility rules. Appellants do not say precisely how much notice would have been sufficient. In view of the alleged difficulty of finding insurance that would have covered an existing condition such as Mrs. Palino's pregnancy, however, it appears that at least as far as the Palinos are concerned only notice before Mrs. Palino became pregnant would have sufficed. The Trustees, of course, did not even decide to amend the eligibility rules until December of 1978, after Mrs. Palino had become pregnant. There is thus implicit in the Palino's claim not only an objection to the adequacy of the notice of the eligibility amendment but, in effect, an objection to the amendment itself.

6. In fact, Palino himself appears to have left "covered employment" to become a self-employed contractor sometime in late 1977 or early 1978. The Trustees suggest that, for this reason alone, Palino was statutorily precluded from renewing his medical insurance through the Fund in the spring of 1979. *See* Labor Management Relations Act § 302(c)(5), 29 U.S.C. § 186(c)(5) (requiring employee benefit plans to be established "for the sole and exclusive benefit of ... employees ... and their families and dependents"); *Dohrer v. Wakeman*, 14 Wash.App. 157, 539 P.2d 91 (1975). Given our resolution of this case on other grounds, we find it unnecessary to reach the statutory issue raised by the Trustees' suggestion. *Cf. Aitken v. IP & GCU-Employer Retirement Fund*, 604 F.2d 1261 (9th Cir. 1979) (denial of benefits to sole proprietor of a printing business upheld on grounds that the eligibility restriction adopted by the trustees was reasonable in light of the apparent requirements of § 302(c)(5)).

conclusion. In reaching this conclusion, we judge the Trustees' actions in accordance with the principle that changes in a fund's eligibility rules must be made, and notice given, subject to the limits of "fundamental fairness." *Kosty v. Lewis*, 319 F.2d 744, 748 (D.C.Cir.1963), *cert. denied*, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964). Such limits are exceeded, for example, when pension eligibility rules are changed without giving notice to those who, with minimal effort, might easily have avoided the loss of all pension rights after many years of pension eligible work. *See, e. g., Valle v. Joint Plumbing Industry Bd.*, 623 F.2d 196 (2d Cir. 1980); *Argo v. Joint Plumbing Industry Bd.*, 623 F.2d 207 (2d Cir. 1980); *Burroughs v. Board of Trustees of the Pension Trust Fund for Operating Engineers*, 542 F.2d 1128 (9th Cir. 1976), *cert. denied*, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); *Kosty v. Lewis, supra.*

We do not believe that the limits of fundamental fairness were exceeded here. For one thing, all participants in the Fund were given considerably more generous notice than that expressly required by ERISA itself.[7] Moreover, the Fund notified appellants—and presumably all other similarly situated Fund participants—before their coverage actually expired. This notice plainly gave most affected individuals adequate opportunity to secure other medical insurance coverage.[8]

Appellants' contention of unreasonableness must essentially rest either upon a claim that the Trustees ought to have determined the particularized notice needs of each individual affected and given notice case by case or upon a claim that somewhat earlier notice to all those affected was, on balance, plainly appropriate. There is no evidence that the first of these alternatives was administratively feasible; common sense suggests that it was not. The second alternative—earlier notice to all—would indeed have helped appellants, and it might have helped others as well. But, giving notice a few months earlier still could not have helped *everyone* who may have needed it (*e.g.*, those who had wives several months more pregnant or who had contracted serious long-term diseases or who had given up other non-repeatable insurance opportunities). And, earlier notice would have involved an additional delay in implementing the new eligibility amendment, which in turn would have imposed significant additional costs on the Fund. Any "time of notice" rule is to some extent arbitrary. The notice at issue here would seem sufficient for all but the unusual case. We have previously pointed out that fund rules and practices inevitably hurt "some individuals who find themselves on the wrong side of the line." *Rueda v. Seafarers International Union*, 576 F.2d at 942. In such cases, we must ask whether, "notwithstanding the injustices which may befall individuals, the scheme as viewed by the trustees is a rational one . . . as a whole." *Id.* Given the extra costs associated with earlier notice, the sufficiency of notice given for nearly all cases, and the impossibility of holding *everyone* harmless, the "prerenewal" notice rule that the Fund followed seems reasonable. For the reasons indicated above, we believe that the eligibility amendment and the notice given Fund participants meet the *Rueda* test.

*Affirmed.*

---

7. ERISA required simply that the Trustees provide notice of the eligibility amendment within 210 days of March 31, 1979, the date on which the Fund's year ends. *See* ERISA § 104(b)(1)(B), 29 U.S.C. § 1024(b)(1)(B).

8. Those who may have suffered because notice was not given earlier are far less seriously injured here than the plaintiffs in the pension plan cases that appellants cite. In those cases, plaintiffs were deprived of benefits that had been building in their accounts over decades. *See, e. g., Valle v. Joint Plumbing Industry Bd., supra; Kosty v. Lewis, supra.*