**Robert T. BOUCHARD, Plaintiff, Appellant,**

v.

**CRYSTAL COIN SHOP, INC., etc., et al., Defendants, Appellees.**

**No. 87–1466.**

United States Court of Appeals, First Circuit.

Heard Oct. 6, 1987.

Decided March 25, 1988.

Jonathan Braverman, Braintree, Mass., with whom Jeanette M. Lucey, Brighton, Mass., and Rivkind, Baker & Golden, P.C., Braintree, Mass., were on brief for plaintiff, appellant.

Alison J. Bell with whom Thomas F. Maffei and Choate, Hall & Stewart, Boston, Mass., were on brief for defendants, appellees.

Before COFFIN, Circuit Judge, BROWN,[*] Senior Circuit Judge, and TORRUELLA, Circuit Judge.

COFFIN, Circuit Judge.

Plaintiff brought this action alleging that defendants had interpreted the terms of an ERISA-qualified pension plan in a manner that wrongfully denied him certain benefits owed under the plan. On cross motions for summary judgment, the district court ordered judgment for defendants on all counts, and plaintiff now appeals. After puzzling over such esoteric questions as when a distribution of nothing occurs and whether a plan participant must consent to receive a distribution of nothing, we find we must vacate and remand with directions to enter judgment for plaintiff.

I.

We review the facts, which are undisputed except as indicated. Plaintiff, Robert Bouchard, began working as a coin sales-

---

[*] Of the Fifth Circuit, sitting by designation.

man for defendant Crystal Coin Shop, Inc. in 1981. As a Crystal employee, Bouchard became a participant in a pension plan ("the Plan"), of which Crystal was the administrator and Crystal's president, Peter Pienta, was the trustee. Pienta was also a participant in the Plan. The Plan was a qualified plan under the terms of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461 (1982).

In the spring of 1984, Pienta informed Crystal's employees that Crystal was considering terminating the Plan. According to Bouchard, Pienta announced that the Plan would terminate on the last day of the Plan year, which was May 31, 1984; Pienta denies that he announced any exact date. Bouchard also claims that Crystal's employees understood at the time that their forfeitable accrued Plan benefits would become nonforfeitable [1] immediately upon the Plan's termination. In May, at Pienta's invitation, Bouchard selected some coins from Crystal's inventory that he wanted to receive in partial satisfaction of his $17,144 forfeitable benefits. On June 6, 1984, apparently without warning to Pienta, Bouchard resigned from his position with Crystal, citing reductions in his sales territory and commensurate decreases in his commissions and benefits. Bouchard exchanged heated words with Crystal's general manager, Phil Greco, but Lenny Pienta, Crystal's vice president, acted as a "peacemaker," and there is no evidence of any conflict between Bouchard and Peter Pienta or the Crystal organization as a whole.

The Plan, as it turned out, was not terminated on May 31 but rather on July 20, 1984, a date that Pienta says was chosen to maximize certain tax benefits to Plan participants and to give the Plan's accountant time to do the necessary paperwork. Thereafter, Bouchard requested that he be paid his benefits under the Plan, arguing that these benefits had vested when the Plan terminated on July 20. Crystal, assertedly relying on advice from the Plan's accountant, informed Bouchard that under the terms of the Plan his resignation on June 6 had caused an immediate forfeiture of his forfeitable benefits, so that he had nothing left to vest when the Plan terminated on July 20 and was thus entitled to no benefits.

Bouchard then brought this action against Crystal as Plan administrator and Peter Pienta as Plan trustee.[2] Bouchard alleged that he was entitled to an accounting and that Crystal had violated the terms of the Plan and breached its fiduciary duties to him; he sought recovery of what he asserted to be his vested benefits. The parties filed cross motions for summary judgment, and the district court ruled in Crystal's favor on all counts. This appeal followed.

## II.

Bouchard's first argument on appeal is that genuine issues of material fact remain as to whether Crystal interpreted the Plan in good faith. The first such issue he identifies revolves around whether Crystal's interpretation was influenced by a desire to retaliate against Bouchard. However, we find nothing in the record sug-

---

1. Nonforfeitable, or vested, accrued benefits are those benefits to which a participant has an unconditional right. 26 C.F.R. § 1.411(a)–4(a) (1987). Conversely, forfeitable, or nonvested, accrued benefits are those benefits to which the participant has only a conditional right. *Id.* For example, a participant's contributions to his own account are always nonforfeitable. On the other hand, employer contributions to a participant's account may initially be forfeitable, only becoming nonforfeitable after the participant has performed a given number of years of service, or upon termination of the plan. *See infra* n. 5. Here, Bouchard had apparently contributed nothing to his account and thus had accrued no nonforfeitable benefits. The value of Crys-

tal's contributions to Bouchard's account had grown to $17,144 but was still forfeitable, because the Plan required four years of employment before the employer's contributions vested, and Bouchard had worked for Crystal for only thirty-eight months.

Hereinafter we will refer to accrued benefits—those benefits that have accrued in an employee's account—simply as "benefits."

2. As the claims asserted against Crystal and Pienta are nearly identical, hereinafter we will refer to both defendants simply as "Crystal" except where otherwise required.

gesting the existence of such a retaliatory motive. There was apparently some bad feeling between Bouchard and Greco, but there is no evidence indicating that Pienta was affected by this animus and no evidence contradicting Pienta's assertion that it was not he but the Plan accountant who arrived at the interpretation now disputed by Bouchard.

The second issue of fact Bouchard identifies has to do with whether Crystal's interpretation was influenced by the circumstance that Pienta stood to gain personally from the interpretation denying Bouchard benefits. It appears from the briefs that the benefits forfeited by Bouchard were, upon the Plan's termination, applied to increase the benefits of other Plan participants, of whom Pienta was one. But Bouchard is raising this argument for the first time on appeal; in the district court, Bouchard neither offered evidence that Pienta stood to gain nor argued that Pienta was so motivated. We find no plain error in the district court's failure to consider a factual issue that was not suggested by the evidentiary record below, and so we will not consider this issue now. We also note the absence of evidence that Pienta did anything to influence the accountant's interpretation of the Plan.

A third possible issue of fact involves whether Bouchard, in resigning from Crystal on June 6, relied on Pienta's representation that the Plan would terminate at the end of the fiscal year, May 31. The record certainly supports an inference that Bouchard thought his benefits would vest on May 31 and thus waited until after that date to resign. The problem is that, although Crystal has repeatedly noted the possibility of such an argument, Bouchard himself has never argued reliance, either in the district court or here. He mentions the argument in passing in his brief, but supports it only with a reference to his own affidavit, which says nothing about reliance. We can only conclude that Bouchard does not think he could prove reliance. In reviewing the grant of summary judgment we are, of course, to draw all reasonable inferences in favor of the non-moving party, but we will not draw an inference that the party himself, despite repeated invitations, has not asked us to draw. *Cf. Bachelder v. Communications Satellite Corp.*, 837 F.2d 519, 522–23 (1st Cir.1988) (rejecting ERISA plan claimants' reliance argument as lacking evidentiary support).

### III.

■ Absent any genuine issue of material fact, the question becomes whether Crystal was entitled to judgment as a matter of law. We first consider whether Crystal's view of the timing of forfeitures under the Plan should be allowed to control. Here, Crystal interprets the Plan to mean that a participant forfeits his forfeitable benefits immediately upon his termination and the distribution to him of his nonforfeitable benefits. Bouchard, on the other hand, asserts that a forfeiture does not occur until the occurrence of certain conditions, and in his view neither of these conditions occurred here.

In resolving this dispute, we are not free to impose our own view of which interpretation is better or fairer; rather, our inquiry is limited by the rule that " '[w]here both the trustees of a pension plan and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control.' " *Jestings v. New England Tel. & Tel. Co.*, 757 F.2d 8, 9 (1st Cir.1985) (quoting *Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Benefit Plan*, 698 F.2d 593, 601 (2d Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983)); *see Bachelder v. Communications Satellite Corp.*, at 521. We are to determine " 'whether the [trustees'] actions were arbitrary and capricious in light of the trustees' responsibility to all potential beneficiaries.' " *Jestings*, 757 F.2d at 9 (quoting *Palino v. Casey*, 664 F.2d 854, 858 (1st Cir.1981)). We agree with the *Miles* court that:

> Where the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner

inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious.

*Miles,* 698 F.2d at 599 (citing cases). We proceed to examine Crystal's interpretation in light of these standards.

## A. *Crystal's Interpretation*

Crystal asserts that the Plan nowhere expressly states when a participant forfeits his forfeitable benefits. Crystal bases its argument that forfeiture can occur immediately upon termination on Section 10.06 of the Plan, which declares:

> Less than 100% Accrued Benefit—Rehired Participant. If a Participant receives an immediate distribution of less than his full Accrued Benefit and later resumes employment as an employee eligible to participate in the Trust, the forfeitable portion of his Accrued Benefit representing contributions prior to termination shall be restored to his account if he repays to the Trustee the full amount of any distribution from the Trust prior to the time a one year break in service has occurred.

In Crystal's view, this section indicates that forfeiture of forfeitable benefits can occur immediately upon termination; otherwise, there would be no need to provide that those benefits be restored to the participant's account if, within one year, he re-

sumes employment and repays what was distributed to him.

Crystal suggests that a look at the background IRS regulations supports this interpretation. The regulations permit plans to include one of two alternative methods for treating the forfeitable benefits of terminated plan participants. A plan may provide for immediate forfeiture with a provision for restoration if a participant who receives a distribution of his nonforfeitable benefits upon termination is later rehired and repays whatever was distributed to him. *See* 26 C.F.R. § 1.411(a)–7(d)(2)(ii) (1987). Such an immediate-forfeiture-with-restoration plan may "involuntarily cashout" a participant by paying him his entire nonforfeitable benefit upon termination and then treating him as having forfeited his forfeitable benefits, but such a plan must provide that the forfeited benefits be restored to the participant's account if he is later rehired and if he repays what was distributed to him. *See id.* § 1.411(a)–7(d)(4)(i).[3] Alternatively, a plan may provide for "delayed forfeiture" of forfeitable benefits: the forfeiture occurs not upon termination but only after the passage of the time period within which restoration could have occurred if the plan were of the immediate-forfeiture-with-restoration type. *See id.* § 1.411(a)–7(d)(2)(iv). Crystal asserts that the restoration provision of Section 10.06 makes sense only if Crystal's Plan is of the immediate-forfeiture-with-restoration type.[4]

---

**3.** This regulation provides in pertinent part:

(i) *Involuntary cash-outs.* For purposes of determining an employee's right to an accrued benefit derived from employer contributions under a plan, the plan may disregard service performed by the employee with respect to which—

(A) The employee receives a distribution of the present value of his entire nonforfeitable benefit at the time of the distribution,

(B) The portion of such distribution which is attributable to the present value of the employer-derived accrued benefit is not in excess of $1,750,

(C) The distribution is made due to the termination of the employee's participation in the plan, and

(D) The plan has a repayment provision which satisfies the requirements of subdivision (iv) of this subparagraph in effect at the time of the distribution.

26 C.F.R. § 1.411(a)–7(d)(4)(i) (1987). Subdivision (iv) merely requires that the disregarded benefit be "restored upon repayment to the plan by the employee of the full amount of the distribution" if the employee resumes employment covered under the plan. *Id.* § 1.411(a)–7(d)(4)(iv).

**4.** Crystal also points to Section 10.05 of the Plan, which provides that the credited service of a rehired participant "shall be restored by the Plan Administrator as if there had been no termination of employment." This provision for later restoration if the participant is rehired indicates that forfeiture of credited service occurs immediately upon termination. In Crystal's view, this supports its interpretation that forfeiture of forfeitable benefits can also occur immediately upon termination.

The final step in Crystal's analysis is its assertion that Bouchard did in fact receive the distribution of his nonforfeitable benefits which was necessary to trigger the "involuntary cash-out" provision described above. The parties agree that as of his termination on June 6, 1984, Bouchard had no nonforfeitable benefits. Although Crystal never actually wrote Bouchard a check for $0.00, Crystal argues that "Mr. Bouchard received the value of his [nonforfeitable] benefits (which was nothing) and Crystal Coin was therefore permitted to disregard his accrued benefits [i.e., consider them forfeited] unless and until he was reinstated in employment." Appellees' Brief at 18.

### B. *Bouchard's Interpretation*

Bouchard does not dispute that he had no nonforfeitable benefits as of June 6, 1984; rather, he argues that those forfeitable benefits he did have as of that date were never forfeited. Bouchard argues that the timing of forfeitures is governed not by Section 10.06, as Crystal claims, but by Section 10.07, which provides:

> Forfeitures. After a Participant has terminated employment, the value of any forfeitable Accrued Benefit of such Participant shall be used to reduce the Employer's future contribution under the Trust upon the earlier of [1] distribution of the Participant's nonforfeitable Accrued Benefit or [2] occurrence of a [one year] Break-in-Service.
>
> No forfeitures under the Trust shall be applied to increase the benefits that any Participant or Beneficiary would otherwise receive at any time prior to the time when the Trust may be terminated or contributions by the Employer discontinued.

Bouchard asserts that neither of the two conditions in the first paragraph occurred prior to the termination of the Plan on July 20; he neither received a distribution nor incurred a one year break in service. Thus, he claims, as of July 20 he had not forfeit-

ed his forfeitable benefits, and the termination of the Plan on that date caused those benefits to become nonforfeitable.[5]

Crystal's response is that Section 10.07 simply governs how and when benefits may be used *once forfeited*. Crystal maintains that it is Section 10.06 that establishes when a forfeiture actually occurs, because Section 10.06's restoration provision suggests that the Plan is of the immediate-forfeiture-with-restoration type. In this type of plan, as we have seen, the forfeiture occurs immediately upon the participant's termination and the distribution to him of his nonforfeitable benefits. Crystal adds that in this type of plan, forfeited benefits are held until such time as restoration may no longer occur. At that point the forfeited benefits may be used to reduce the employer's future contributions or, if the plan has terminated, to increase the benefits distributed to the remaining plan participants. In Crystal's view, Section 10.07 does not establish the time at which a forfeiture occurs but only the time at which a forfeiture becomes non-restorable, thus freeing the benefits to be used for one of these other purposes.

Bouchard also argues that an IRS General Counsel Memorandum, GCM 39,310, prohibits a plan participant's termination from triggering an immediate forfeiture. The Memorandum examines 26 C.F.R. § 1.411(a)–7(d) and concludes that "none of [its] provisions allow a forfeiture to take place simply because an employee separates from service. That is, separation from service is not an event which may cause forfeitable accrued benefits to become forfeitures." GCM 39,310 (April 4, 1984), *reprinted in* [1984–1985 Transfer Binder] IRS Positions Rep. (CCH) 1550 at 5085.

But the Memorandum also states that separation from service, if coupled with a distribution of the participant's nonforfeitable benefit, may indeed trigger a forfeiture. "In the case of a qualified plan which provides that participants who sepa-

---

5. Under Section 11.06 of the Plan, "[u]pon termination of the Trust ... 100% of the Accrued Benefit of each affected Participant shall be-

come nonforfeitable, and shall not thereafter be subject to forfeiture."

rate from service *will be paid their vested accrued benefits*, a participant who separates from service and is paid his vested accrued benefit need not become further vested if the plan terminates before he incurs a break in service." *Id.* at 5080 (emphasis added). That, says Crystal, is precisely what happened here. Bouchard upon his termination had no nonforfeitable benefit, and thus, although he received no actual distribution, he could be treated as having received what was owed him: a distribution of his nonforfeitable benefit, which was nothing. Therefore, he did not have to become further vested when the Plan terminated; he could be treated as having forfeited his forfeitable benefit and thus as having had nothing left to vest.

### C. *Our View*

We are not entirely satisfied by Crystal's interpretation of the Plan. We do not understand, for example, how Section 10.07 can treat a forfeiture as non-restorable upon distribution of a participant's nonforfeitable benefit, which can occur immediately upon termination, whereas Section 10.06 does not treat a forfeiture as non-restorable until after the occurrence of a one year break in service. We also have difficulty squaring Crystal's interpretation of Section 10.07 with the "involuntary cash-out" regulation, 26 CFR § 1.411(a)–7(d)(4)(i), which permits a forfeiture to be triggered by a distribution of a participant's nonforfeitable benefit, yet requires that at the time of the distribution the forfeiture must still be restorable.

Nevertheless, Bouchard's explanation of Sections 10.06 and 10.07 is even less convincing. He cannot point to any Plan language unambiguously supporting his contention that the Plan is of the delayed-for-feiture type. Nor can Bouchard explain why, if Section 10.07 really establishes that forfeiture cannot occur immediately upon termination but only when one of two conditions is fulfilled, there would be any need for the restoration provision in Section 10.-06. Bouchard's interpretation would thus render one of the Plan provisions superfluous. *Cf. Miles*, 698 F.2d at 599 (stating that a trustee's interpretation that would

render some plan provisions superfluous may be arbitrary and capricious).

We therefore conclude that Crystal's interpretation of the Plan as providing for immediate-forfeiture-with-restoration is not arbitrary and capricious. Although we are not swept away by the force of Crystal's logic, neither are we convinced that Crystal has imposed a standard not required by the Plan's provisions, interpreted the Plan in a manner inconsistent with its plain words, or rendered any Plan provisions superfluous. *Cf. Miles*, 698 F.2d at 599. Nor are we persuaded that Crystal's explanation is inconsistent with the IRS regulations or with GCM 39,310. *Cf. Dennard v. Richards Group, Inc.*, 681 F.2d 306, 314–16 (5th Cir.1982) (stating that a trustee's plan interpretation that is contrary to IRS regulations, rulings, or interpretations is evidence of arbitrariness or lack of good faith). The language of the Plan simply does not clearly state when forfeitures occur; we cannot say that Crystal's interpretation of that language is arbitrary or capricious or was reached in bad faith.

### IV.

■ That is not, however, the end of the inquiry. Although we accept Crystal's interpretation that forfeiture may occur immediately upon termination, termination alone does not trigger a forfeiture. As noted above, Crystal acknowledges that an additional step is necessary: distribution to the participant of the participant's nonforfeitable benefits. Crystal argues that this condition was met here: because Bouchard had no nonforfeitable benefits as of June 6, he could be treated as having "received the present value of his vested benefits (which was nothing) and Crystal Coin was therefore permitted to disregard his accrued benefits," i.e., consider them forfeited. Appellees' Brief at 18. Bouchard, of course, argues that because he received nothing, he should not be treated as having received a distribution of his nonforfeitable benefits. Thus, he concludes, a necessary precondition for forfeiture was never met.

We find the fiction offered by Crystal rather difficult to swallow. In an attempt to determine whether the Plan authorizes such metaphysical transactions in these circumstances, we turn to Section 10.04 of the Plan, entitled "Distribution of Nonforfeitable Accrued Benefit," as to which we have the benefit of further briefs submitted by the parties at our request.

Section 10.04 provides in pertinent part as follows:

> When a Participant ceases to be an employee, his nonforfeitable Accrued Benefit may
>
> a. be distributed to the Participant after a [one-year] Break-in-Service has occurred ... or
>
> b. with the written consent of the Participant and approval of the Plan Administrator, be distributed to the Participant before a Break-in-Service has occurred ... or
>
> c. be deferred to a date no later than the Participant's Normal Retirement Date....

As can readily be seen, this section provides three different ways in which a terminated participant's nonforfeitable benefits may be distributed to him. We need only consider one of these. As it is undisputed that, prior to the termination of the Plan, Bouchard neither incurred a one year break in service nor reached his normal retirement date, the only provision of Section 10.04 that could possibly apply to Bouchard is 10.04(b), requiring Bouchard's written consent before any distribution to him. It is similarly undisputed that Crystal never did obtain such written consent.

Where the parties differ is on the question whether Crystal was required to comply with Section 10.04(b) at all. Bouchard contends that Section 10.04(b) is mandatory—that if Crystal wanted to trigger an immediate forfeiture by distributing to Bouchard his nonforfeitable benefits, Crystal was required to obtain Bouchard's written consent, even if the distribution amounted to nothing. Crystal, on the other hand, argues that Section 10.04 as a whole is *not* mandatory: it provides several ways in which nonforfeitable benefits "may" be dis-

tributed, but does not say they "shall" be distributed only in one of those three ways. Crystal thus insists that the failure to obtain Bouchard's consent was no bar to the immediate distribution of Bouchard's nonforfeitable benefits and the consequent forfeiture of his forfeitable benefits.

Our task, once again, is to determine whether Crystal's interpretation is arbitrary and capricious. We begin by explaining our view of the importance of the written consent provision: it protects the participant who has left Crystal's employ from being immediately cashed out of the Plan against his or her will. Put simply, the participant's power to forestall for up to one year any distribution of nonforfeitable benefits effectively equals the power to veto the forfeiture of forfeitable benefits at any time during that year. Such veto power would be of obvious value to participants—like Bouchard—who leave Crystal in the year prior to the Plan's termination. By forestalling forfeiture, they retain their rights to forfeitable benefits through the date when the Plan terminates, causing those benefits to become nonforfeitable. The power to veto distribution of nonforfeitable benefits thus has value even if, as in Bouchard's case, the nonforfeitable benefits themselves are worth nothing. And the veto power has value even where the participant—unlike Bouchard here—does *not* know that the Plan will be terminated within the year, as it allows the participant to wait out the year on the chance that the Plan will terminate.

Against this background, we have great difficulty accepting Crystal's view of the written consent provision as non-binding. Crystal would have us believe that although the clear language of Section 10.04 gives a participant veto power over an immediate distribution, and although this veto power has some value to the participant even if the distribution itself would amount to nothing, Section 10.04 itself is wholly optional and Crystal is therefore free to devise other means of distribution that deprive the participant of this value. We can think of no clearer example of an interpre-

tation that renders Plan language superfluous.

Crystal's insistence that additional, unenumerated means of distribution are available also ignores the language of Section 10.01. That section states that a terminated participant's rights to accrued benefits "shall be governed by the following provisions of this Article," meaning Article X, of which Section 10.04(b) is a part. We think "shall be governed" means what it says. Section 10.04, entitled "Distribution of Nonforfeitable Accrued Benefits," governs such distributions; it is not merely a precatory, incomplete list of suggestions as to how Crystal, in the absence of some better idea, could choose to proceed.

Finally, Crystal argues strenuously that the "involuntary cash-out" regulation, 26 C.F.R. § 1.411(a)–7(d)(4)(i), permits a plan to distribute nonforfeitable benefits of up to $1,750 to a terminated participant without his or her consent. *See supra* n. 3. Crystal contrasts this with the "voluntary cash-out" regulation, *id.* § 1.411(a)–7(d)(4)(ii), which permits cash-outs of unlimited value so long as the participant consents. Although Crystal appears correct in its interpretation of what the regulations permit, that is not the question here. The question, rather, is what the Plan language requires. We suppose that Crystal could have written into the Plan an exception to Section 10.04(b) that would have permitted involuntary cash-outs involving nonforfeitable benefits of less than $1,750, but Crystal did not do so.

We therefore conclude that Crystal acted arbitrarily and capriciously in interpreting Section 10.04(b) to permit a distribution to Bouchard without his consent, even though the distribution itself would have amounted to nothing. With that essential prop removed, Crystal's whole house of cards comes tumbling down: without Bouchard's consent, there could be no distribution; without a distribution, there could be no forfeiture; without a forfeiture, Bouchard still held rights in his forfeitable benefits on the date the Plan terminated; the termination caused those benefits to become nonforfeitable. The district court there-

fore should have granted summary judgment to Bouchard rather than Crystal.

*Vacated and remanded for computation and entry of judgment for plaintiff-appellant.*