486 A.2d 798

Franklin B. STAGGS, et al

v.

BLUE CROSS OF MARYLAND, INC., et al.

No. 538, Sept. Term, 1984.

Court of Special Appeals of Maryland.

Jan. 14, 1985.

382

Charles Lee Nutt, Baltimore (Clements & Nutt, Baltimore, on brief), for appellants.

Harrison M. Robertson, Jr., Baltimore (Michael Esher Yaggy and Niles, Barton & Wilmer, Baltimore, on brief), for appellees.

Argued before WILNER, ADKINS and ALPERT, JJ.

WILNER, Judge.

Franklin B. Staggs, John E. Hyde, and Robert L. Mason, appellants here, are former employees of Blue Cross of Maryland, Inc. (Blue Cross). Staggs was hired in 1969; Hyde and Mason began their employment in 1972. They were each members of the sales staff, their duties being to call on potential customers to induce them to buy Blue Cross health plans. None of the appellants had a fixed contract or term of employment, although all were covered by certain personnel policies adopted by Blue Cross, as set forth in a 1975 policy memorandum.

During January and February, 1978, Blue Cross effected the termination of appellants' employment. Each was accused of falsifying his sales reports—*i.e.*, stating that he had made more customer calls than he actually made. Mason and Hyde were permitted to resign in lieu of dismissal; Staggs was actually dismissed.

In August, 1980, appellants filed this action in the Circuit Court for Baltimore County. In a two-count declaration, they charged Blue Cross with breach of contract (Count I) and five supervisory employees of Blue Cross with intentional and malicious interference with their employment agreement (Count II). The agreement sued upon, they averred, was "partly oral and partly in writing," the written part "being in the sole control of Blue Cross" and consisting of the policies and procedures set forth in the policy memorandum. The relevant portions of that memorandum, as revealed in subsequent pleadings and discovery documents, were as follows:

"IV. Employees terminating due to dismissal are subject to the following conditions:

A. Except in extreme cases when dismissal will be immediate, employees will be given at least two formal counseling sessions by their supervisors and/or manager before final dismissal. All formal counseling sessions must be first reviewed with the Employment and Employee Relations Department prior to any discussion with the em-

ployee. Formal counseling sessions with employees must be substantiated in writing by filing form 5.65 Problem Solving Report with the Employment and Employee Relations Department. During the second counseling session, the employee will be advised that continuance of the problem may result in dismissal. Failure to sign form 5.65, Problem Solving Report after it has been discussed, may provide grounds for immediate dismissal.

\*    \*    \*    \*    \*    \*

E. An employee may be dismissed at any time for cause without liability to Blue Cross and Blue Shield of Maryland."

Upon completion of discovery, the court granted a motion for summary judgment filed by Blue Cross and denied a similar motion on the part of the individual defendants. After two false starts, appellants have filed a proper appeal from the court's entry of judgment for Blue Cross,[1] raising the following complaints:

"The lower court erred in granting the Defendant Blue Cross' Motion for Summary Judgment for two reasons, first because there were abusive discharges of each plaintiff.

The lower court erred in granting Defendant Blue Cross' Motion for Summary Judgment, second, because the Defendant's personnel policies respecting the termination of

---

1. As explained in *Staggs v. Blue Cross of Maryland, Inc.*, 57 Md.App. 576, 471 A.2d 326 (1984), appellants noted their first appeal in December, 1982. In March, 1983, realizing that there was no final judgment under Md.Rule 605a, they attempted to dismiss the appeal, but because the motion to dismiss was filed in the circuit court, no action was taken on the motion and the appeal remained extant. The circuit court then attempted to correct the jurisdictional problem by making a certification under Rule 605a, following which a second appeal was noted. We dismissed the appeal, however, on the ground that, due to the pendency of the first appeal, the circuit court's action was a nullity. Upon the receipt of our mandate, the circuit court again made a certification under Rule 605a, and this appeal ensued.

employees became contractual obligations which Blue Cross violated."

Appellants do not deny that they did, in fact, submit false sales reports on a frequent, if not regular, basis. Nor do they deny that such actions were wrongful. The basis of their complaint is that they were directed by their supervisors to falsify those reports, and that they did so reluctantly. Through deposition testimony, appellants averred that Blue Cross had a requirement that sales representatives make six to seven sales calls each day, that they and other salesman complained to their supervisors that it was not possible to meet that requirement on a daily basis, and that they were told "if we couldn't make them, we should fudge them." They each objected to such a practice, but their objections were rejected. In accordance with the instruction thus given to them, they then began to add fictitious calls to their weekly sales reports in order to meet the six to seven calls per day requirement.

### (1) *Abusive Discharge*

■ Appellants' first contention is grounded on *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981). They argue in their brief that "[t]he clear mandate of public policy is against supervision ordering employees to make false reports and then to discharge them for such activity." We need not address that issue. As noted, the sole claim made against Blue Cross was breach of contract. The tort of abusive discharge, recognized in *Adler*, was not pled below, and it is therefore not properly before us.

### (2) *Breach of Contract*

■ The breach of contract claim requires some analysis. First, in terms of the "standing" of the individual appellants, Staggs, as we noted, was actually dismissed; Hyde and Mason resigned. Ordinarily, an employee who resigns cannot complain that his termination was improper; however, as we held in *Beye v. Bureau of National Affairs*, 59 Md.App. 642, 477 A.2d 1197, *cert. denied* 301 Md. 639, 484 A.2d 274 (1984), Maryland recognizes the concept

of constructive discharge. In a proper case, we said at 649, the law "will overlook the fact that a termination was formally effected by a resignation if the record shows that the resignation was indeed an involuntary one, coerced by the employer."

Although most of the discussion in *Beye* was in the context of a resignation allegedly prompted by dangerous working conditions, we in no way suggested that a constructive discharge could not arise from some other coercive setting. Indeed, we called attention to *Cumb. & Penn. R.R. Co. v. Slack*, 45 Md. 161 (1876), where the Court entertained a breach of contract action by an employee who resigned in response to a notice from the employer making clear that the employment was being terminated. The essential point made in *Slack* was more recently expressed in *Jackson v. Minidoka Irrigation Dist.*, 98 Idaho 330, 563 P.2d 54, 58–59 (1977):

> "The fact of discharge ... does not depend upon the use of formal words of firing. The test is whether sufficient words or actions by the employer would logically lead a prudent man [or woman] to believe his [or her] tenure had been terminated.... Employees are often asked to resign as opposed to being fired. While this may be done for any number of reasons, the meaning is clear that the employee is being dismissed."

That, in effect, is what Hyde and Mason allege here. Through deposition testimony, they averred that they were told by Blue Cross officials that the decision had been made to terminate their employment, that if they resigned they would be able to collect unemployment compensation benefits, but if they were discharged those benefits would be unavailable. Both claimed that they resigned only in response to that inducement, which inducement, in fact, turned out to be false.

The record extract does not indicate that Blue Cross ever denied these allegations of Hyde and Mason. Even if it did, there would, at the very least, be presented an issue of material fact that could not be decided on summary judg-

ment. If these averments are true, the terminations of Hyde's and Mason's employment would amount to constructive discharges; their resignations could be regarded as nothing more than coerced responses to decisions already made by Blue Cross and communicated to them. We therefore conclude, upon the record before us and for purposes of summary judgment, that all three appellants have established sufficient standing to claim that they were, in fact, discharged by Blue Cross.

We next must consider the nature of the employment agreement alleged by them.

In *Adler v. American Standard Corp., supra,* 291 Md. 31, 35, 432 A.2d 464 the Court reaffirmed the common law rule that "an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time." That but begs the issue, however. The question is whether the contracts in dispute here, which are otherwise of indefinite duration, have been so modified by the personnel policy statement as to remove them from the full strictures of the common law rule. As was said in *Hodge v. Evans Financial Corp.,* 707 F.2d 1566, 1568 (D.C.Cir.1983),

"Though the classic assumption of the law is that the parties intend a contract of indefinite term to be terminable at will, basic principles of contract law inform us that the parties can contract otherwise. The controlling factor is the intent of the parties with respect to the terms of the contract...."

There has been a great deal of litigation in recent years, throughout the country, over the effect of personnel handbooks and other types of policy statements issued by employers on "at will" employment agreements. Although there has yet to develop any uniform rule and the decisions vary somewhat, depending on the type of provision sought to be enforced and the theory pled by the employee, most of the more recent decisions seem to reflect the view that such unilateral pronouncements by an employer may create legally enforceable expectations on the part of its employees.

Perhaps the best exposition of this view is found in *Toussaint v. Blue Cross & Blue Shield of Mich.*, 408 Mich. 579, 292 N.W.2d 880, 892 (1980). The Court there began by confirming the general rule that indefinite hirings are terminable at the will of either party. It noted, however, that,

> "While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly."

*Id.*, 292 N.W.2d at 892. In adopting such policies, said the Court, the employer has "created a situation 'instinct with an obligation.'" *Id.* Thus, it continued,

> "We hold that employer statements of policy, such as the Blue Cross Supervisory Manual and Guidelines, can give rise to contractual rights in employees without evidence that the parties mutually agreed that the policy statements would create contractual rights in the employee, and ... [even though] the statement of policy is signed by neither party, can be unilaterally amended by the employer without notice to the employee, ... contains no reference to a specific employee, his job description or compensation, ... no reference was made to the policy statement in pre-employment interviews[,] and the employee does not learn of its existence until after his hiring."

*Id.*

From this, the Court concluded that where the employer "had established a company policy to discharge for just cause only, pursuant to certain procedures, had made that policy known to Toussaint, and thereby had committed itself to discharge him only for just cause in compliance with the procedures," *id.*, a jury could find that "[a]lthough Toussaint's employment was for an indefinite term ... the

relationship was not terminable at the will of Blue Cross." *Id.*

Essentially the same principle was espoused by the Supreme Court of Minnesota in *Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn.1983). There, too, the question was whether a personnel handbook, which in that case touted the "job security" offered by the employer and set forth a specific "disciplinary policy," sufficed to limit the otherwise broad discretion of the employer to discharge an employee without a fixed term of employment. The issue was one of contract law—whether the handbook represented the offer of a unilateral contract that was accepted by the employee.

Although recognizing that "[a]n employer's general statements of policy are no more than that and do not meet the contractual requirements for an offer," the Court concluded that "[a]n employer's offer of a unilateral contract may very well appear in a personnel handbook.... By preparing and distributing its handbook, the employer chooses, in essence, either to implement or modify its existing contracts with all employees covered by the handbook." *Id.,* 626, 627. In the particular case, the Court held that the precatory language in the handbook regarding "job security" did not suffice to create a permanent employment, but that the specific provisions on disciplinary procedures, requiring reprimands and an opportunity to correct the perceived deficiencies, *were* contractually binding. Thus, the Court concluded that "the bank breached its employment contract with Mettille by not affording him the job termination procedures of its handbook...." *Id.,* 631.

*See also Brooks v. Trans World Airlines, Inc.,* 574 F.Supp. 805 (D.Colo.1983); *Carter v. Kaskaskia Community Action Agency,* 24 Ill.App.3d 1056, 322 N.E.2d 574 (1974); *Shah v. American Synthetic Rubber Corp.,* 655 S.W.2d 489 (Ky.1983); *Arie v. Intertherm, Inc.,* 648 S.W.2d 142 (Mo.App.1983); *Forrester v. Parker,* 93 N.M. 781, 606 P.2d 191 (1980); *Hammond v. North Dakota State Personnel Bd.,* 345 N.W.2d 359 (N.D.1984); *Langdon v. Saga*

*Corp.*, 569 P.2d 524 (Okla.App.1977); *Yartzoff v. Democrat-Herald Pub. Co., Inc.*, 281 Or. 651, 576 P.2d 356 (1978); *Osterkamp v. Alkota Mfg., Inc.*, 332 N.W.2d 275 (S.D.1983); *Hamby v. Genesco., Inc.*, 627 S.W.2d 373 (Tenn.App.), *app. denied* (1982); *Piacitelli v. Southern Utah State College*, 636 P.2d 1063 (Utah 1981); and *cf. Griffin v. Erickson*, 277 Ark. 433, 642 S.W.2d 308 (1982). *See also Vinyard v. King*, 728 F.2d 428 (10th Cir.1984), and *Conley v. Board of Trustees of Grenada County Hosp.*, 707 F.2d 175 (5th Cir.1983), concluding that termination provisions in a personnel handbook can give an employee for indefinite term a property interest in continued employment for purposes of an action under 42 U.S.C. § 1983.

Not all courts have adopted this view. Some have rejected the theory of a fluid offering of a unilateral novation or amendment to the employment agreement and held flatly that an employee handbook, especially one distributed after an employee is hired, does not become part of that employee's contract. *See Beidler v. W.R. Grace, Inc.*, 461 F.Supp. 1013 (E.D.Pa.1978), *aff'd* 609 F.2d 500 (3d Cir.1979), applying Pennsylvania law; *Uriarte v. Perez-Molina*, 434 F.Supp. 76 (D.D.C.1977); *White v. Chelsea Industries, Inc.*, 425 So.2d 1090 (Ala.1983); *Muller v. Stromberg Carlson Corp.*, 427 So.2d 266 (Fla.App.1983); *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779 (1976); *Gates v. Life of Montana Ins. Co.*, 638 P.2d 1063 (Mont.1982); *Edwards v. Citibank, N.A.*, 100 Misc.2d 59, 418 N.Y.S.2d 269 (N.Y.Co.1979); *Richardson v. Charles Cole Memorial Hosp.*, 320 Pa.Super. 106, 466 A.2d 1084 (1983); and *cf. Terrio v. Millinocket Community Hospital*, 379 A.2d 135 (Me.1977).

The Maryland Court of Appeals addressed one aspect of the issue in *Dahl v. Brunswick Corp.*, 277 Md. 471, 356 A.2d 221 (1976). Several former employees of Brunswick, who had neither written employment contracts nor a collective bargaining agreement, sued to recover severance and vacation pay allegedly provided for in a Policies and Procedures Manual issued by the employer. The first question

considered by the Court was "whether Brunswick's severance pay policy statement became part of the employment contract between it and its employees." *Id.*, 277 Md. at 475, 356 A.2d 221. As to that, the Court noted that "Brunswick concedes, *as it should*, that its policy directive with respect to severance pay constituted an offer of a unilateral contract of which the employees were aware and, by continuing to work for Brunswick, accepted." (Emphasis added.) *Id.* "[T]here is abundant support," the Court added, "for the proposition that employer policy directives regarding aspects of the employment relation become contractual obligations when, with knowledge of their existence, employees start *or continue* to work for the employer." (Emphasis added.) *Id.*, 277 Md. at 476, 356 A.2d 221.

Blue Cross seeks to distinguish *Dahl* on a number of bases, most having to do with what it perceives the facts in this case to be. In terms of legal theory, there can be little doubt that the Court of Appeals has alined itself with what appears to be the majority rule. We can see no substantial difference, in this regard, between provisions in a handbook or personnel policy statement affording post-termination benefits, such as severance pay, and those affording pre-termination benefits, such as requiring that termination be for cause or setting forth a prerequisite mechanism for rehabilitating a deficient employee.

Accordingly, we hold that provisions in such policy statements that limit the employer's discretion to terminate an indefinite employment or that set forth a required procedure for termination of such employment may, if properly expressed and communicated to the employee, become contractual undertakings by the employer that are enforceable by the employee. In so holding, we caution that not every statement made in a personnel handbook or other publication will rise to the level of an enforceable covenant. As the Minnesota Court observed in *Pine River State Bank, supra*, 333 N.W.2d at 626, "general statements of policy are no more than that and do not meet the contractual requirements for an offer."

■ The circuit court gave no reasons for its decision to grant Blue Cross's motion for summary judgment. To warrant the entry of such judgment, the record would have to establish, as a matter of law, that (1) Hyde and Mason were not constructively discharged, or (2) applying the reasoning set forth above, the specific provisions of the 1975 policy memorandum dealing with termination did not constitute contractual undertakings, or (3) those provisions, even if contractual in quality, were complied with. The record establishes none of these predicates, as a matter of law. From what is before us, it would seem that Hyde and Mason were, in fact, constructively discharged. The extent to which the termination provisions in the policy memorandum were made known to the appellants and were intended by Blue Cross to govern employee terminations is not altogether clear. Finally, the important question of whether, in light of the instructions allegedly given to appellants by their supervisors, their terminations were for "cause" is a matter upon which reasoning minds might differ.

It is therefore clear that summary judgment was inappropriate. The basic underlying factual issues must be tried.

JUDGMENT VACATED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE COUNTY FOR TRIAL; APPELLEES TO PAY THE COSTS.