**Donald BACHELDER, et al., Plaintiffs,**

v.

**COMMUNICATIONS SATELLITE CORPORATION, et al., Defendants.**

**Civ. No. 84–0310 P.**

United States District Court, D. Maine.

April 6, 1987.

424

Robert E. Mittel, Portland, Me., Paul R. Dumas, Jr., Rumford, Me., for plaintiffs.

William J. Kayatta, Jr., Louise K. Thomas, Portland, Me., for defendants.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

This is a class action suit brought by approximately 100 participants in an employee stock option plan adopted in 1976 by Defendant Communications Satellite Corporation (Comsat). Plaintiffs have brought three counts against Defendants, claiming that they have not received the full distribution from the stock option plan to which they are entitled. Count II, alleging a breach of fiduciary duty, has been settled, and Count III, alleging a breach of contract, has been temporarily stayed. The only matter currently before the Court on these cross motions for summary judgment is Count I: an allegation that Defendants breached fiduciary and statutory duties imposed by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.* (1982) (ERISA). The Court finds that there are no issues of material fact in dispute and that therefore resolution by summary judgment is appropriate.

Under the terms of Comsat's plan, the accounts of participating employees are periodically credited with shares of stock and small quantities of cash representing fractional shares of stock. Upon retirement,

job termination, or participation in the program for seven years, an employee is entitled to receive a distribution in either stock or cash. The plan itself does not specify the date upon which shares of stock are to be converted into cash for distribution to employees who have elected to receive cash payments after participating in the program for seven years. It says only that "[t]o effect such distributions, the Committee may direct the Trustee to sell the appropriate number of shares of Corporation Stock on the open market." Communications Satellite Corporation Employee Stock Ownership Plan (Restated, effective January 1, 1983) § 7.5A.

The date of conversion from stock to cash is, however, specified in the Summary Plan Description (SPD)[1] that was distributed by Comsat to plan participants. The following language appeared in the 1983 SPD:

> Let's say, for example, that for 1976 your account was credited with 20 shares of COMSAT stock that were worth $700 at that time. During the 84 months through 1983, that portion of your account grew in value to $1,200 (due to dividends paid and reinvested as well as gains in market value). As soon as possible after the end of 1983, you'd receive a payout in shares of stock (and cash for any fraction of a share) or entirely in cash equal to $1,200.

Although the Defendants have disputed its import, this language clearly sets the last day of the year as the date of conversion from stock to cash, stating explicitly that if an employee's account is worth $1200 at the end of 1983, then as soon as possible after the end of 1983 the employee would receive a payout of $1200.

The current dispute involves employees who, having participated in the plan for seven years, were entitled to a distribution at the end of 1983, and who, in response to forms distributed in December 1983, indicated that they wished to receive that distribution in cash. Comsat stock sold for $32.75 per share on December 31, 1983; however, Comsat did not actually sell the stock until early March 1984. The average net proceeds per share was $25.75, and it was this amount that was used as the basis for employee distributions. The Plaintiffs claim that the 1983 SPD obligated the Defendants to base the distribution on the December 31, 1983 price of $32.75.

As stated above, the Court finds that the 1983 SPD unambiguously promises that participants who elect to receive a cash distribution will have their stock converted to cash at its value on December 31, 1983 and paid to them as soon as possible thereafter.[2] The Court is not persuaded by Defendants' argument that the general language in a later paragraph that "the value of each year's payout will depend on fluctuations in the market price of our stock" because "common stock can go up or down in value" has the effect of contradicting the specific example of a distribution that appears in the paragraph before it. The intervening text between the two sections

---

1. ERISA requires that a summary plan description of an employee benefit plan be furnished to participants, that it be written in a manner calculated to be understood by the average plan participant, and that it be sufficiently accurate and comprehensive to reasonably apprise participants of their rights and obligations under the plan. The SPD must contain certain specific information including a description of circumstances that may result in disqualification, ineligibility, or denial or loss or benefits. 29 U.S.C. § 1022 (1982).

2. Under *Jestings v. New England Telephone & Telegraph Co.*, 757 F.2d 8 (1st Cir.1985), the Court is bound to accept the interpretation of ambiguous plan terms put forth by the plan's trustees if "the language of the plan will bear the interpretation that [the trustee] places upon it." *Id.* at 9. Similarly, the First Circuit held in *Rueda v. Seafarers Int'l Union of North America*, 576 F.2d 939 (1st Cir.1978), that "[w]e need not be convinced that the trustees' approach is the only or the best way to plan and maintain the integrity of the fund. We need only be convinced that it is a rational one and is supported by a reasonable reading of the regulations." *Id.* at 943. Both cases require the courts to pay great deference to the interpretation of plan terms offered by a trustee, but both also require that that interpretation be a reasonable one. In the current case, the Court finds that the plan's language is not ambiguous and that, for the reasons enunciated in the text, it cannot reasonably be interpreted in the manner urged by the Defendants.

explains that participants may forego a payout in any given year and allow their stock to continue to accumulate within the plan. Placed in context, it is clear that the language quoted by the Defendants is a comment upon the risks involved in foregoing a distribution and not on the mechanics and timing of the 1983 distribution. The interpretation offered by the Defendants is untenable, as it requires unnecessarily reading the document as internally inconsistent and ignoring proximity, intervening discussions, and paragraph separations in determining whether one provision modifies another.[3]

■ Having determined the meaning of the SPD provision, the Court must now consider whether the SPD is binding on the Defendants. It is a requirement of 29 U.S.C. § 1104(a)(1)(D) that employee stock option plans be administered "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter." Under 29 U.S.C. § 1132, a plan participant may bring a civil action to recover benefits due under the terms of his plan. It is therefore necessary to determine whether the SPD constitutes a governing document or instrument of the plan and whether its provisions may be considered terms of the plan. For the reasons discussed below, the Court answers these questions in the affirmative.

■ The provisions of section 1104 are to be interpreted in light of the common law of trusts. *See* H.R.Rep. No. 93–533, 93 Cong. 2d Sess. 11–13, *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4649–51; *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (Brennan, J., concurring); *Donovan v. Mazzola,* 716 F.2d 1226, 1231 (9th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). Under the *Restatement (Second) of Trusts* § 4 comment a (1959), if the document establishing a trust is silent on one of the terms of the trust, then a later document may be relied on in establishing that term, particularly if the later document is drawn with a high degree of care and formality. Such circumstances exist in the present case: the document that contains the most comprehensive catalog of plan terms does not specify the date at which stock-to-cash conversions will occur for employees receiving a payout after seven years of participation in the plan, but this information is contained in the 1983 SPD, a twelve-page document that explains plan terms authoritatively and in detail and that has obviously been drawn with care and presented as a formal statement of policies and procedures. Under the *Restatement,* such terms must be considered "terms of the trust" and as such, the document in which they are contained must be considered a document "governing the plan" for the purposes of 29 U.S.C. § 1104(a)(1)(D). Therefore, a failure to comply with terms con-

---

**3.** The full text of the relevant three paragraphs reads as follows:

If you decide to receive the payout for a given plan year, the amount of each payout will be equal to that number of shares that went into your account 84 or more months earlier and any additional shares purchased with reinvested dividends on those shares. Since allocation of COMSAT stock for the plan's first year was made for 1976, the first payouts under this plan provision will be made available in early 1984 to participants who have COMSAT stock relating to 1976.

Let's say, for example, that for 1976 your account was credited with 20 shares of COMSAT stock that were worth $700 at that time. During the 84 months through 1983, that portion of your account grew in value to $1,200 (due to dividends paid and reinvested as well as gains in market value). As soon as possi-

ble after the end of 1983, you'd receive a payout in shares of stock (and cash for any fraction of a share) or entirely in cash equal to $1,200. The rest of your account would remain intact. The next year, in 1985, your 1977 shares would be distributed to you if you decided to receive a payout. And so on. If you decide not to receive a payout for a given plan year, the election to do so will be available to you annually in following years. You may not, however, receive a payout for a given plan year unless payouts available to you for earlier plan years are first or simultaneously distributed.

The value of each year's payout will depend on fluctuations in the market price of our stock. While we hope that our stock will pay dividends and gain in value, there can be no guarantee. Common stocks can go up or down in value.

tained in the 1983 SPD constitute a breach of fiduciary duty under this section.

This result is consistent with the result reached by the Eleventh Circuit in *McKnight v. Southern Life & Health Ins. Co.*, 758 F.2d 1566 (11th Cir.1985), a case in which that court held that language in an SPD is binding upon an employer even if it contradicts language in the original plan description. The court reasoned that there would be no purpose in requiring the distribution to employees of a summary plan description of a benefit program if there were not a requirement that the description was one that could be depended upon to be controlling. *Id.* at 1570. Similarly, the court in *Cooke v. Chapter Hawley Hale Stores, Inc., Group Health Care Plan, et al.*, No. 85C–1683, slip op. (N.D.Ill. July 2, 1986) [Available on WESTLAW, DCT database], held that a summary plan description may serve as a "governing plan document" under ERISA. *See also Gors v. Venoy Palmer Market, Inc.*, 578 F.Supp. 365 (E.D.Mich.1984).

The Court also finds it significant that numerous state courts have ruled that employers are contractually bound by promises made in employee handbooks.[4] This

---

4. This issue was recently analyzed in *Duldulao v. Saint Mary of Nazareth Hosp. Center*, 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314 (Jan. 30, 1987) (WESTLAW, Allstate Library, Ill. file). In a slip opinion filed prior to the expiration of the statutory period for rehearing, the Supreme Court of Illinois summarized the state of the law as follows:

> The contractual status of employee handbooks has been the subject of a great deal of litigation in recent years. Several courts have rejected the notion that an employee handbook or manual can ever create binding contractual obligations. (*See, e.g., Uriarte v. Perez-Molina* (D.D.C.1977), 434 F.Supp. 76 (applying D.C. law); *White v. Chelsea Industries, Inc.* (Ala.1983), 425 So.2d 1090; *Heideck v. Kent General Hospital, Inc.* (Del.1982), 446 A.2d 1095; *Muller v. Stromberg Carlson Corp.* (Fla. App.1983), 427 So.2d 266; *Shaw v. S.S. Kresge Co.* (1975), 167 Ind.App. 1, 328 N.E.2d 775; *Johnson v. National Beef Packing Co.* (1976), 220 Kan. 52, 551 P.2d 779; *Richardson v. Charles Cole Memorial Hospital* (1983), 320 Pa.Super. 106, 466 A.2d 1084; *Reynolds Manufacturing Co. v. Mendoza* (Tex.Civ.App.1982), 644 S.W.2d 536). However, the overwhelming majority of courts considering the issue have held that an employee handbook may, under proper circumstances, be contractually binding. (*See, e.g., Vinyard v. King* (10th Cir. 1984), 728 F.2d 428 (applying Oklahoma law); *Lincoln v. Sterling Drug, Inc.* (D.Conn.1985), 622 F.Supp. 66 (Connecticut law); *Barger v. General Electric Co.* (W.D.Va.1984), 599 F.Supp. 1154 (Virginia law); *Smith v. Teledyne Industries, Inc.* (E.D.Mich.1984), 578 F.Supp. 353 (Ohio law); *Brooks v. Trans World Airlines, Inc.* (D.Colo.1983), 574 F.Supp. 805 (Colorado law); *Leikvold v. Valley View Community Hospital* (1984), 141 Ariz. 544, 688 P.2d 170; *Pugh v. See's Candies, Inc.* (1981), 116 Cal.App.3d 311, 171 Cal.Rptr. 917; *Salimi v. Farmers Insurance Group* (Colo.App.1984), 684 P.2d 264; *Finley v. Aetna Life & Casualty Co.* (1985), 5 Conn.App. 394, 499 A.2d 64; *Jackson v. Minidoka Irrigation District* (1977), 98 Idaho 330, 563 P.2d 54; *Wyman v. Osteo-* pathic Hospital of Maine, Inc. (Me.1985), 493 A.2d 330; *Staggs v. Blue Cross of Maryland, Inc.* (1985), 61 Md.App. 381, 486 A.2d 798; *Toussaint v. Blue Cross & Blue Shield* (1980), 408 Mich. 579, 292 N.W.2d 880; *Pine River State Bank v. Mettille* (Minn.1983), 333 N.W.2d 622; *Enyeart v. Shelter Mutual Insurance Co.* (Mo.App.1985), 693 S.W.2d 120; *Morris v. Lutheran Medical Center* (1983), 215 Neb. 677, 340 N.W.2d 388; *Southwest Gas Corp. v. Ahmad* (1983), 99 Nev. 594, 668 P.2d 261; *Woolley v. Hoffmann-LaRoche, Inc.* (1985), 99 N.J. 284, 491 A.2d 1257; *Forrester v. Parker* (1980), 93 N.M. 781, 606 P.2d 191; *Bolling v. Clevepak Corp.* (1984), 20 Ohio App.3d 113, 484 N.E.2d 1367; *Langdon v. Saga Corp.* (Okla.Ct.App.1976), 569 P.2d 524; *Yartzoff v. Democrat-Herald Publishing Co.* (1978), 281 Or. 651, 576 P.2d 356; *Osterkamp v. Alkota Manufacturing, Inc.* (S.D.1983), 332 N.W.2d 275; *Hamby v. Genesco, Inc.* (Tenn. App.1981), 627 S.W.2d 373; *Piacitelli v. Southern Utah State College* (Utah 1981), 636 P.2d 1063; *Thompson v. St. Regis Paper Co.* (1984), 102 Wash.2d 219, 685 P.2d 1081; *Mobil Coal Producing, Inc. v. Parks* (Wyo.1985), 704 P.2d 702).

Id. at ___, 106 Ill.Dec. 10–11, 505 N.E.2d at 317. The Court went on to rule:

> We find particularly persuasive the opinion of the Supreme Court of Minnesota in *Pine River State Bank v. Mettille* (Minn.1983), 333 N.W.2d 622, which analyzed an employee handbook in terms of the traditional requirements for contract formation: offer, acceptance, and consideration (333 N.W.2d 622, 625). In *Pine River* an employee handbook was distributed to the plaintiff several months after he began working for defendant.... The court [found the booklet to contain] a specific offer for a unilateral contract—the bank's promise in exchange for the employee's performance, *i.e.*, the employee's labor. (333 N.W.2d 622, 630.) By performing, the employee both accepted the contract and provided the necessary consideration, and thus the bank's dismissal of the plaintiff without

view is consistent with the Court's finding that language contained in Comsat's SPD, a document quite analogous to an employee handbook, gives plan participants specific rights and forms part of the plan's terms.

Defendants contend that even if they failed to comply with the 1983 SPD, such a failure is not actionable absent detrimental reliance by the Plaintiffs. They base this assertion on the First Circuit's holding in *Govoni v. Brick Layers, Masons, & Plasters Int'l Union of America, Local No. 5 Pension Fund*, 732 F.2d 250 (1st Cir.1984). *Govoni*, however, addressed a violation of ERISA's reporting requirements under 29 U.S.C. § 1022 and not, as in the present case, a breach of fiduciary duty actionable under 29 U.S.C. § 1104. In *Govoni*, the court found that the circulation of an SPD with confusing language that is subject to two different interpretations violates the standard of clarity imposed by 29 U.S.C. § 1022 and, because of that lack of clarity, does not fulfill that statute's requirement that participants be informed of circumstances which may result in loss of benefits. Nevertheless, the court found that because Govoni had in no way relied upon his interpretation of the SPD, he could not recover for the trustees' failure to comply with ERISA's reporting provisions.

The current case is distinguishable. Defendants are exposed to liability not for a failure to accurately report the provisions of their plan but for a failure to comply with a term of the plan clearly manifested in a formal plan description distributed to participants. *Govoni's* holding was not addressed to such a situation and cannot be extended to apply to it without conflicting with ERISA provisions allowing plan participants to bring civil actions to recover

benefits due under the terms of their plan. *See* 29 U.S.C. § 1132. Govoni was not denied any benefit due to him under the terms of his plan; the Plaintiffs in the current case have been.

Accordingly, it is ORDERED that the Plaintiffs' Motion for Summary Judgment be, and it is hereby, GRANTED as to Count I.

the benefit of the progressive disciplinary procedures constituted a breach of the employment contract. 333 N.W.2d 622, 630–31.

Following the reasoning in *Pine River,* we hold that an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present. First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be dissem-

inated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement. When these conditions are present, then the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed.

*Id.* at ___, 106 Ill.Dec. 12, 505 N.E.2d at 318.