968 F.2d 1213
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Paul L. WASHINGTON, Plaintiff-Appellant,
v.
DIGITAL EQUIPMENT CORPORATION, Defendant-Appellee.
 No. 91-1217.
 United States Court of Appeals,
Fourth Circuit.
 Argued: May 4, 1992
Decided: July 21, 1992
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, District Judge. (CA-90-1249-A)
 ARGUED: Bruce Michael Bender, Van Grack, Axelson, Williamowsky & Jacibs, P.C., Rockville, Maryland, for Appellant.
 Thomas R. Bagby, Epstein, Becker & Green, P.C., Washington, D.C., for Appellee.
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 Before WIDENER, MURNAGHAN, and SPROUSE, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 The present case arises on appeal from a determination in favor of appellee Digital Equipment Company ("DEC") in a two count complaint filed by appellant Paul Washington ("appellant"). On February 28, 1991, appellant filed a two count complaint seeking relief in Count I for an alleged violation of Title VII of the 1964 Civil Rights Act, and in Count II for alleged breach of contract.
 
 
 2
 DEC filed a motion for summary judgment on both counts, which was denied by the district judge on March 19, 1991. Trial was held on July 29 and 30, 1991. At trial, a jury was impaneled and given the duty of resolving the Count II breach of contract claim, while the district judge reserved the responsibility for determination of the Count I Title VII claim. After hearing part of appellant's case, the district judge, finding that appellant had failed to establish the existence of a contract, granted appellee's motion for summary judgment (Count II), and dismissed the jury. On the following day, the remainder of the evidence for the Count I claim was presented.
 
 
 3
 On September 13, 1991, the district court issued its Findings of Fact and Conclusions of Law in which it found in favor of DEC on the remaining Title VII claim. The district court held that appellant had failed to make an adequate showing that any adverse employment decision regarding appellant had been made in retaliation for his complaints about racial discrimination, and that appellant had falsified his employment application which precluded his claims. The district court granted DEC's motion for attorney's fees and costs. Appellant filed a timely notice of appeal. We conclude that while the district court properly ruled in DEC's favor in regard to both counts in the complaint, the court erred in granting DEC's motion for attorney's fees.
 
 I.
 
 4
 Appellant, a black male, was originally hired by DEC as a sales representative on October 3, 1983. Appellant filled out an application for employment which included false information about his educational qualifications. Appellant had not earned a college degree, but submitted information that indicated that he had received an "A.A." ("Associate of Arts") degree from a Maryland community college. In addition, appellant allegedly told an official of DEC that he had received such a degree. Appellant read and signed a certification that the information he offered was truthful, and which indicated that any erroneous provision of information could be met with a dismissal action.
 
 
 5
 In addition, appellant, in applying to DEC for employment, indicated in writing and in an interview with a DEC official, that his most recent employment had been a job with Xerox, and that he had held that job until "the present." Subsequent evidence indicated that appellant had been involuntarily dismissed from his job at Xerox approximately four months prior to his application to DEC.
 
 
 6
 On his first day of employment, appellant received a DEC handbook which detailed, inter alia, disciplinary procedures that the company followed. The handbook indicated that DEC obligated itself, "in most cases," to perform a four step procedure when some kind of discipline was appropriate. The four steps included: a problem solving session, a verbal warning, a written warning, and a termination action.
 
 
 7
 Appellant was supervised by William Siwak from the commencement of his employment until April of 1985. After approximately one year of work, appellant received a "4", or"requires development," rating from Siwak. During that period, appellant had apparently met or exceeded 100% of his sales quotas. On December 17, 1984, appellant was given a verbal warning because his performance for Fiscal Year 1985 had been deficient up to that time. Deficiencies cited in the memorandum which accompanied the warning included failure to provide accurate forecast data, unacceptable performance in developing new business opportunities, and failure to make use of resources in the clerical and technical areas. Those issues had been previously discussed with appellant in a performance review. Eugene Hedge, a black male and appellant's district manager, also observed that appellant was performing his work unsatisfactorily at or around the end of 1984.
 
 
 8
 On June 18, 1985, Siwak improved appellant's performance rating to a "3" or "meets requirements" level. At that time appellant received a 4.9% salary increase. Beginning in July of 1985, and culminating in April 1987, appellant's supervisor was Richard Kreitzer. In June of 1986, appellant received another "3" rating, this time from Kreitzer, and received a 7% salary increase. Kreitzer, witnessing deficiencies in appellant's performance, placed him on a "development plan," but he also testified that such an imposition of a plan was not uncommon, that the plan was not to be considered as, and never directly resulted in, any disciplinary action, and that appellant met the goals of the development procedures.
 
 
 9
 In the Spring of 1987, appellant received a new supervisor, Doug Havas. Appellant received another 7% salary increase in the Summer of 1987. At the time of the review covering that raise, appellant received a substantial indication of performance deficiencies on his part from Havas' evaluation. Those deficiencies included: late and incomplete reports, problems with a large account with Howard University, low quality of quotations given to customers, late submission of a request for proposal for Washington Hospital Center, inaccurate price quotations, and problems with orders from Children's Hospital.
 
 
 10
 In 1988, Havas removed appellant from his position as lead sales representative for the Howard University account, and replaced him with another black male salesperson. Havas had received complaints about appellant from Howard, including statements that appellant's credibility was significantly questioned in the University community. Following that move, appellant took advantage of DEC's policy for complaints about treatment by managers, and complained about the treatment he had received from Havas. Appellant testified that he specifically mentioned his belief that he was being treated differently because of his race. Other officials of DEC testified that the appellant never mentioned any racial trouble in his initial verbal complaint, and that his written summary of concerns, filed on April 8, 1988, did not list racial discrimination as one. The official to whom appellant complained, Eunice Zachary, concluded that there was no basis for his claims, and witnessed many of the same problems experienced by other officials in her interaction with appellant.
 
 
 11
 In May of 1988, Mary Walker, a black woman, became appellant's supervisor. Later that month, Walker discussed certain performance deficiencies with appellant, and listed concerns stated at a meeting with appellant in a memorandum which outlined another development plan to assist the plaintiff in becoming more "organized and focused." The plan required appellant to perform certain specific tasks, and increased appellant's sales quota. There was no evidence presented by appellant that Walker was aware of any past complaints of racial discrimination made by him.
 
 
 12
 On June 16, 1988, appellant appeared in front of DEC's Career Development Committee. The committee gave him a significantly negative review, specifically finding that he answered questions in a manner indicative of a less experienced sales official.
 
 
 13
 Appellant testified at trial, with no additional factual support, that during the time, following his first complaints about management personnel, he was subjected to racial discrimination. He also testified that officials responded harshly when he suggested that he was a victim of discrimination, telling him not to use the word discrimination, or he would be subject to a charge of insubordination.
 
 
 14
 On August 22, 1988, Walker was replaced as appellant's supervisor by Doris Brenner. On September 15, 1988, after reviewing negative aspects of appellant's record, Brenner held a problem solving session with him in which she suggested that he work on sales skills; account, time and territory management; and management communication. Appellant was again placed on an action plan to improve his skills. At that time, appellant sought a transfer to another district of the company. After thirty days, appellant was unsuccessful in securing a transfer. Subsequently, Brenner received a complaint about appellant from an official at Children's Hospital. The official told the supervisor that appellant was unable satisfactorily to answer questions about the computer system, and that he had fostered confusion within the hospital staff concerning the equipment. On November 9, 1988, appellant was taken off the Children's Hospital account, and was issued a 60 day verbal warning, which included references to the complaint from Children's, appellant's failure to attend meetings, and his failure to review an action plan prepared for him.
 
 
 15
 On December 16, 1988, a 60 day written warning was drafted by Brenner, in which she noted that appellant had failed to meet the criteria of his action plan, and that he had failed to perform at the level expected of him as a Level III Sales Representative. The written notice was never filed. In January of 1989, with the help of Kenneth Hamilton, a black sales unit manager at DEC, appellant received a procedurally exceptional transfer to Hamilton's department. Hamilton viewed the transfer as a "fresh start" for appellant, and performed a limited review of appellant's past performance, and of past criticisms of that performance. At the time of the transfer, appellant was told by DEC officials that though his transfer had nullified his presence on the company's corrective action procedure, he would still be subject to immediate elevation to the third stage of that procedure, the written warning stage, if his past problems continued. Brenner had been prepared to file the written notice she had drafted prior to the transfer.
 
 
 16
 Soon after appellant's transfer, Hamilton began to notice performance problems, and as early as March of 1989, Hamilton began to document them. The problems cited by Hamilton included tardiness, failure to attend meetings, failure to complete price quote documentation, and failure to communicate customer concerns to DEC officials quickly. On April 21, 1989, Hamilton issued a 30 day written notice for appellant. An action plan was once again instituted, and appellant again failed to meet the requirements of the plan to the satisfaction of his superiors. Hamilton testified that he decided to terminate appellant's employment because he failed to meet the requirements of the final action plan. Hamilton consulted with others in the company before making his final decision. On June 5, 1989, appellant was informed of the termination.
 
 
 17
 During trial, after appellant had presented some of his witnesses, the district court revisited the summary judgment question concerning the breach of contract claim. The court concluded, after allowing appellant an opportunity to provide any additional evidence available to him, that appellant had failed to produce sufficient evidence to indicate that an employee handbook constituted an employment contract, and, accordingly, granted DEC's summary judgment motion at that time. After the close of trial, the district court concluded that appellant had failed to establish that any action taken by DEC was in retaliation for claims of racial discrimination, and that all employment actions carried out against appellant were supported by legitimate reasons. The court found that there was a lack of proof of any causal connection between the alleged complaints of racial discrimination, assuming they were ever made, and any subsequent disciplinary action by DEC officials. In addition, the court ruled that appellant's falsification of his employment records precluded his bringing a Title VII complaint. The court granted to DEC costs and attorney's fees, but did not provide an explicit finding to justify its award.
 
 II.
 
 18
 Following full trial, the district court, as the trier of fact and of law, made a conclusion as to the propriety of appellant's Title VII action. Our review of such a determination is made pursuant to the "clearly erroneous" standard. McNairn v. Sullivan, 929 F.2d 974, 978-979 (4th Cir. 1991). Accordingly, we must affirm the decision of the district court unless, after review of the record, we are"left with the definite and firm conviction that a mistake has been committed." Mallory v. Booth Refrigeration Supply Co., Inc., 882 F.2d 908, 909 (4th Cir. 1989).
 
 
 19
 In a complaint claiming a violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000c (1988), a plaintiff is required, in order to make a prima facie showing of discrimination, to show that he or she engaged in protected activity, that the employer took adverse action, and that a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985). In the present case, the claim advanced by appellant alleges that he received adverse action from DEC because of the protected activity of complaining about racial discrimination on the job.
 
 
 20
 The district court did reach one clearly erroneous conclusion. Specifically, the court concluded that there was no evidence, beyond that provided in the appellant's own testimony, that he had complained of racial discrimination to any supervisors. Actually, there was factual support provided by testimony of at least one DEC official that appellant had complained of racial discrimination. But, even accepting the existence of that error, there is certainly sufficient evidence of legitimate non-discriminatory justification for any and all adverse action imposed upon appellant to justify affirmance of the district court's conclusion under the clearly erroneous standard. The additional factual support of appellant's complaints of racial discrimination is de minimis.
 
 
 21
 Once a legitimate nondiscriminatory justification for adverse action is provided by a defendant in a Title VII action, the plaintiff must show "that the employer's proffered reason is pretextual." Ross, 759 F.2d at 365. Even if we were to accept that racial discrimination was a minimal factor in the treatment of appellant, (and on the evidence in the record we would be remarkably unlikely to do so) substantial evidence was provided to support an alternative non-discriminatory explanation for appellant's dismissal which was clearly valid, and not merely a post-hoc pretext for discrimination.
 
 
 22
 Appellant received substantial and continued negative reviews from superiors. He also received repeated "second chance" offers, and uncommon accommodations. Appellant's work was criticized by officials of at least two major clients with whom he worked. A high percentage of the DEC officials charged with oversight of appellant were of his same race, and although such a factor is not conclusively determinative that DEC did not discriminate, it certainly tends to support the district court's conclusions that it was appellant's unsatisfactory level of work, and not his race, that engendered negative response for his supervisors.
 
 
 23
 A possible alternative ground to support the district court's conclusions is provided by evidence that appellant falsified his employment application material, specifically, that he stated that he had attained a level of education which he had not in fact attained, and that he was, at the time of his application to DEC, an employee in good standing at Xerox.
 
 
 24
 In Smallwood v. United Air Lines, Inc., 728 F.2d 614 (4th Cir. 1984), we held that if it can be shown that a false statement made by a job applicant induced an employer to hire the applicant, and if the employer can provide a showing that it would not have hired him if it had known the truth, then the defendant employer is provided with a defense to a Title VII claim which indicates that the misrepresentation, and not the claimed discrimination, was the reason for the disciplinary action. Id. at 624. In the present case, witnesses testified that appellant stated in pre-hiring interviews that he had received a college degree, and that he was an employee in good standing at Xerox. Appellant does not contend that he did have a college education or that he was not fired from Xerox. He cites his trial testimony that he never represented to the contrary to DEC officials. DEC provided evidence that he did misrepresent himself, however, and that it had a policy of not hiring people without a college education, or people who make false statements when they apply for a job.
 
 
 25
 There was sufficient evidence on the record to support the district court's conclusions (1) that DEC would not have hired appellant had it known of the falsity of his alleged statements to it, and (2) that appellant made the false statements. The conclusion hence provides additional support for the court's finding in favor of DEC.
 
 III.
 
 26
 The district court concluded that DEC was entitled to an award of attorney's fees and costs from appellant. The court did not provide an express justification for the award. It is unclear from the opinion exactly what conclusion about appellant's case provided the basis for the district court's determination as to attorney's fees. The court's failure to provide an explicit justification for its award violates the Supreme Court's mandated procedure for allowing a defendant attorney's fees in a Title VII action. Accordingly, we reverse the grant of attorney's fees.
 
 
 27
 A grant of attorney's fees for a victorious defendant in a Title VII action by a district court, in its discretion, is justified "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978).
 
 
 28
 The Court cautioned district courts as to the limits that should be applied to the grant of attorney's fees to victorious defendants.
 
 
 29
 In applying these criteria, it is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success.
 
 
 30
 Christiansburg, 434 U.S. at 921-2.
 
 
 31
 In addition to its failure to provide a specific finding that appellant's claim was frivolous or unreasonable, the district court's failure to grant two attempted summary judgment motions made by DEC, one before, and one during trial, indicate that the court itself believed that appellant's claims possibly had at least some merit. In Glymph v. Spartansburg General Hospital, 783 F.2d 476 (4th Cir. 1986) we were provided with a similar circumstance. In Glymph, the district court had granted a victorious defendant in a Title VII claim attorney's fees and costs holding that the complaint had been frivolous. The defendant in the case, as in the present case, sought summary judgment or dismissal at two times in the proceedings, once before and once during trial. The summary judgment motions were denied. Following trial, the court waited "some weeks" before entering its opinion. In the present case the opinion was filed approximately two weeks after the close of trial. In Glymph, we concluded that:
 
 
 32
 Such a careful and studied consideration of [plaintiff's] claim of racial discrimination may tend to show that the district court at the time did not believe the matter to be frivolous. While we do not think the denial of summary judgment in favor of the hospital and the like denial of its motion to dismiss ... are binding decisions that the plaintiff had made out at least a prima facie case ... it is arguable that such is implicit in those rulings.
 
 
 33
 Id. at 480. We did not, however, base our conclusion that the district court abused its discretion solely on the failure to grant summary judgment. We included our perception that the evidence provided was neither unreasonable or without foundation. Id .[1]
 
 
 34
 Our review of the evidence in the present case suggests that the evidence presented by appellant, although far from convincing, was sufficient to withstand a characterization as frivolous. Our conclusion is supported by the district court's own reluctance to dispense with the case at an early stage. As indicated by the Supreme Court, provision of attorney's fees and costs to the defendant in a Title VII action should be awarded rarely. Caution should prevail particularly, as here, when a motion for summary judgment on the part of the defendant is twice denied by the district court, and when the district court fails to offer a specific justification for the grant in its opinion. The district court's grant of attorney's fees, absent an express finding of frivolousness, coupled with its two-time denial of DEC's summary judgment motions, constitutes an abuse of discretion. Accordingly, we are obliged to reverse the grant.
 
 IV.
 
 35
 Appellant has contended that the district court erred in first denying appellee's summary judgment motion regarding the breach of contract claim prior to trial and then granting the same motion following presentation of appellant's evidence.
 
 
 36
 Initially, appellant contends that the "law of the case" doctrine expressed in Arizona v. California, 460 U.S. 605 (1984), specifically that courts should avoid reconsideration of matters already decided during the course of a single lawsuit, serves to invalidate the district court's action in the present case. Appellant's claim is baseless. The determination not to grant summary judgment is not the kind of final judgment of an issue that requires application of the law of the case rule. A decision not to grant summary judgment does not resolve any factual or legal issue, and is not appealable as a final order. It is well accepted that no more justification need be offered to support a trial judge's reversal of his or another district judge's negative ruling on a summary judgment motion than the mere assertion that the judge changed his or her mind, or disagreed with the conclusion of his or her predecessor. Cale v. Johnson, 861 F.2d 943, 948 (4th Cir. 1988); Foster v. Tandy Corp., 828 F.2d 1052, 1058 (4th Cir. 1987); Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986).
 
 
 37
 Alternatively, appellant has argued that the trial court's legal conclusion as to the propriety of the summary judgment on the contract claim grant was erroneous. Appellant's contention has been that the handbook which expressed the discipline and review procedures followed by DEC constituted a contract of employment.
 
 
 38
 The determination of the propriety of a grant of summary judgment by a district court in a contract dispute is complex. The first step of the process is "to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face." World-Wide Rights Ltd. Partnership v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992). If the court properly concludes that the contract is unambiguous, it may make conclusions as to the intent of the agreement as a matter of law. Id. Even in instances where the contract is found to be ambiguous, however, the district court may examine extrinsic evidence provided on the record "and, if that evidence is, as a matter of law, dispositive of the interpretive issue, grant summary judgment on that basis." Id. Accordingly, the district court's grant of summary judgment must be affirmed if the evidence on the record supports the district court's legal conclusion as to the nature of the contractual obligation.
 
 
 39
 Appellant has contended that the law of the state in which the alleged contract was formed should govern our review of the contract claim. That is here unmistakably true. The employment 'contract' between parties was formed in Maryland. In Maryland, as in most other common law jurisdictions, when an employee is hired for no specific term, as appellant was here, the contract is generally presumed to be "at will" and may be terminated by either party at any time. Suburban Hospital v. Dwiggins, 596 A.2d 1069, 1073 (Md. 1991). Maryland law, as that of other states, however, allows for an exception to the general rule when an employee handbook contains policy statements that are communicated to the employee as restrictions on the employer's right to terminate the employee, and are relied upon.
 
 
 40
 In Staggs v. Blue Cross of Maryland, Inc., 486 A.2d 798 (Md. App. 1985), the Court of Special Appeals of Maryland reviewed a claim of former employees alleging breach of an implied employment contract. The alleged contract was a policy statement by the defendant which detailed the procedures the defendant agreed to follow for "[e]mployees terminating due to dismissal." Id. at 799. The court indicated that the central issue was whether "the contracts in dispute here, which are otherwise of indefinite duration, have been so modified by the personnel policy statement as to remove them from the full strictures of the common law rule." Id. at 801. The court concluded that the intent of the parties was the key to a determination of exactly to what extent the "at will" contract was altered. In citing additional precedent, the court concluded that
 
 
 41
 where the employer had established a company policy to discharge for just cause only, pursuant to certain procedures, had made that policy known to [plaintiff], and thereby had committed itself to discharge him only for just cause in compliance with procedures, a jury could find that although [plaintiff's] employment was for an indefinite term the relationship was not terminable at will.
 
 
 42
 Id. at 802 (citations omitted).
 
 
 43
 The court concluded that "provisions ... that limit the employer's discretion to terminate an indefinite employment or that set forth a required procedure for termination of such employment may ... become contractual undertakings by the employer that are enforceable by the employee. Id. at 803 (emphasis added). The court went on to caution, however, that "not every statement made in a personnel handbook or other publication will rise to the level of an enforceable covenant ... general statements of policy are no more than that and do not meet the contractual requirements of an offer." Id. at 804 (citation omitted).
 
 
 44
 Relevant sections of the "Corrective Action and Discipline" provision of the DEC handbook presented to appellant in the present case read as follows:
 
 
 45
 Digital maintains a Corrective Action and Discipline procedure designed to be fair and impartial when an employee is experiencing performance problems. Based on a premise that corrective action and discipline should be positive, this procedure is intended to prevent terminations whenever possible.
 
 
 46
 In most cases, the Corrective Action and Discipline procedure involves the following steps: 1. Problem Solving ... 2. Verbal Warning ... 3. Written Warning ... 4. Discharge .... If, after a reasonable period of time, the employee's performance does not improve, the employee will be terminated by the company.
 
 
 47
 (emphasis added). DEC has attempted to distinguish the present situation from that in Staggs by pointing out that the language in the DEC handbook is conditional (e.g. "In most cases ... "), general, and does not express a mandatory limitation on appellee's discretion to terminate employees.
 
 
 48
 Even if we should find that the "in most cases" language in the contract is ambiguous, the district court was still justified in determining, as a matter of law, whether the entirety of the evidence presented left no issues of material fact as to the meaning of the provision, justifying the grant of summary judgment. The provision cited above, viewed in the context of the entire DEC handbook, clearly does not provide for mandatory dismissal procedures. Although the exact effect of the "in most cases" provision may be uncertain, the language clearly suggests that at least in some cases DEC is not obligated to go through the four step process set out in the provision. Any such conditional statement should not induce our determination that a "promise" has been added to what was in its origins an "at will" agreement. The district court made the proper legal conclusion when it determined that the Corrective Action and Discipline provision did not constitute an employment contract, in that it was a general statement of policy, and did not constitute an offer on the part of appellee.
 
 
 49
 It cannot successfully be urged that the decision that there was no enforceable contract came too soon, occurring prior to the end of the case. The appellant, before the district judge ruled on the point, was asked whether he had additional evidence indicating a limit to DEC's discretion to terminate, or requiring a preliminary step or specific procedure for termination. The appellant, in response, produced no such evidence.
 
 
 50
 Accordingly, the district court's grant of summary judgment must be affirmed.[2]
 
 Conclusion
 
 51
 The district court's order on behalf of DEC as to the Title VII and contract claims is affirmed, while the grant of attorney's fees to DEC is reversed.
 
 
 52
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
 
 
 
 [1]
 Also, in Introscaso v. Cunningham, 857 F.2d 965, 968 (4th Cir. 1988), we indicated that the Glymph opinion "did not set out a per se rule on the effect of denial of a directed verdict motion, but rather took the ruling into account along with other factors in deciding whether a lawsuit was without merit."
 
 
 [2]
 It is likely that the evidence presented at trial would support the district court's conclusion on additional factual grounds if it was found that the handbook provision constituted a contract. It is reasonably clear that DEC followed the relevant procedures set out in the Corrective Action provision when it terminated appellant