Bernard E. **CLEARY, et al.,**
**Plaintiffs, Appellants,**

v.

**GRAPHIC COMMUNICATIONS INTERNATIONAL UNION SUPPLEMENTAL RETIREMENT AND DISABILITY FUND, et al. Defendants, Appellees.**

No. 87-1396.

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1987.

Decided March 15, 1988.

---

Before COFFIN, TORRUELLA and SELYA, Circuit Judges.

TORRUELLA, Circuit Judge.

This appeal follows a one-day trial which resulted in a judgment entered against appellants. Plaintiffs-appellants are former members of the Graphic Communications International Union ["GCIU"]. They worked in the trade for over 30 years and were participants in the GCIU Supplemental Retirement and Disability Fund ["the Fund"] since its inception in 1967. The GCIU Fund is an employee benefit plan governed by the Employee Retirement Income Security Act ["ERISA"], 29 U.S.C. § 1001 *et seq*. Defendants-appellees are the Fund, its Board of Trustees and its administrator.

At issue in this case is appellants' entitlement to supplemental benefits. This substantial portion of Fund benefits [1] is available when a Fund participant reaches age 60 and is covered by the plan having at least 10 years of credited service. In case of interruptions in covered employment, Fund participants could remain eligible if a covered employer made any contribution on their behalf during two consecutive years. That is, part-time employees of covered employers would remain eligible as long as the latter made contributions on their behalf at least once every two years. Alternatively, participants could maintain their eligibility by working as full-time employees of a local union.

Appellants found themselves out of covered employment when their employer went out of business in 1981. At the time, they were on average about five years short of reaching age 60. Efforts to find covered employment proved fruitless, even with GCIU assistance. Union officials told appellants that one way to save their eligibility was by working part-time for the local union, thus allowing it to make contributions on their behalf.

Marc B. Gursky with whom Lovett, Schefrin & Gallogly, Providence, R.I., was on brief, for plaintiffs, appellants.

Robert W. Lovegreen with whom Gidley, Lovegreen & Sarli, Providence, R.I., was on brief, for defendants, appellees.

---

**1.** Appellants are undisputedly entitled to receive "vested benefits" under the Plan, which amount to roughly $50.00 monthly, to be paid for the rest of their lives beginning at age 65. Supple-

mental benefits represent monthly payments ranging between $400 and $600 in the case of appellants, during the five years between ages 60 and 65.

This practice was clearly against Fund rules but was used successfully for some time. The former Fund administrator had told union officials informally that participants could retain their eligibility for supplemental benefits by working on a part-time basis for the local union. Based on this information, appellants proceeded to take other non-covered employment and worked during off-hours in menial jobs for local unions, in some cases only once or twice per year. The local union made contributions on their behalf—none greater than 45 cents in any given year.

By the time appellants were about to reach the age of 60, the Fund stopped the practice of accepting contributions from local unions for part-time employees. From the Fund's perspective, the change in the practice upon which appellants relied resulted from the accidental discovery that 17 local unions had been making contributions on behalf of 134 part-time employees. This discovery occurred late in the fall of 1984.[2]

After the discovery, the Fund Trustees decided to alert all local unions that they would not accept any further contributions on behalf of part-time union employees; the Fund also returned all such contributions already made. In the spring of 1985 the Fund administrator notified appellants that their applications for supplemental benefits were denied.[3]

In February 1985 the Fund liberalized its eligibility rules for supplemental benefits.[4] The amendment was made retroactive as of February 1, 1984. According to the Fund administrator, the reason for making the rule retroactive to February 1984 was that the eligibility problem was first studied in 1984 and, historically, GCIU Fund benefit improvements had been determined and implemented at the February Board of Trustees meeting. Even under these liberalized rules, appellants remained ineligible for supplemental benefits.

Out of 134 participants on whose behalf local unions had made contributions for part-time employment, 41 were already receiving benefits when the Fund discontinued the practice. Those 41 beneficiaries were allowed to continue receiving supplemental benefits. The others were told that they were ineligible to receive supplemental benefits. In the notice letter, those participants were advised that they could still recover eligibility by earning at least 22 weeks of credited service in each of two consecutive years immediately prior to retirement. None of the appellants travelled this route.

### Discussion

Appellants raise two arguments in support of their claim. First, they argue the Fund is estopped from denying them supplemental benefits because they relied to their detriment both on representations binding on the Fund and on the Fund's practices and treatment of other beneficiaries. Their second line of reasoning attacks as arbitrary and capricious the Fund's determinations that (1) beneficiaries who were already receiving supplemental benefits after using the same method as appellants would continue to receive bene-

2. The Fund's failure to discover this widespread practice earlier was explained on two grounds. First, covered employers could hire part-time employees and make contributions on their behalf. Secondly, local unions could call employees of covered employers to act as part of a negotiating committee and make contributions on behalf of those employees for the duration of their participation in the committee. Thus, neither small, irregular contributions, nor the fact that they came from local unions need have alerted the Fund to the practice.

3. In February and in October 1984 appellant Cleary wrote to the Fund administrator to ascertain his eligibility and the amount of his supplemental benefits. On both occasions the admin- istrator preliminarily confirmed Cleary's eligibility according to Fund records and informed him of an estimated monthly payment of nearly $600.00. In February 1985 the Fund administrator advised Cleary that additional information was required to process Cleary's application, given the apparent impropriety of the contributions made on his behalf.

4. Under the liberalized rules, participants with 15 years of credited service and 10 years of participating service would be allowed 70% of supplemental benefits for a participant ceasing covered employment at age 55, 80% at age 56 and 90% at age 57, with all benefits payable at age 60.

fits and (2) the liberalization of eligibility rules adopted in 1985 be retroactive only to February 1984.

We will discuss these contentions in the same order.

## I. *Estoppel*

The principle of estoppel allows recovery upon a showing of (1) a representation of fact made to the plaintiff; (2) a rightful reliance thereon; and (3) injury or damage to plaintiff resulting from a denial of benefits by the party making the representation. *Haeberle v. Board of Trustees of Buffalo Carpenters Health–Care, Dental, Pension and Supplemental Funds,* 624 F.2d 1132, 1139 (2d Cir.1980). Courts have frequently refused to apply estoppel principles to require payment of pension funds, usually referring to the basic policy of protecting the actuarial soundness of pension plans.[5] *See Chambless v. Masters, Mates & Pilots Pension Plan,* 772 F.2d 1032, 1041 (2d Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1189, 89 L.Ed.2d 304 (1986); *Phillips v. Kennedy,* 542 F.2d 52, 55 n. 8 (8th Cir.1976); *Thurber v. Western Conference of Teamsters' Pension Plan,* 542 F.2d 1106, 1108–09 (9th Cir.1976) (per curiam). This court addresses this issue now for the first time.

Our analysis of the estoppel doctrine must address several levels of actual or constructive representations. First, union officials told appellants they could retain their eligibility by working part-time for the local union. Second, the union officials apparently relied on informal representations made by the former Fund administrator. Third, the Fund's acts (confirming preliminarily appellant Cleary's eligibility, accepting contributions on appellants' behalf, and actually disbursing supplemental benefits to similarly situated participants) could be construed as bases for reasonable reliance relevant to the estoppel arguments.

■ Appellants relied on statements by union officials, believing that contributions for their sporadic work would preserve their eligibility. They had received and read the Fund rules, so presumptively they knew that part-time employment for a local union would not save their eligibility. However, they also knew that other former employees had begun to receive supplemental benefits after working part-time for local unions. Appellants testified that based on that information they stopped looking for employment with a participating employer,[6] thus eventually losing their eligibility for the supplemental benefits.

Representations made by a union official, clearly contrary to the written fund rules, cannot be binding on the Fund. *See Chambless,* 772 F.2d at 1041; *Chamberlin v. Bakery & Conf. Union,* 99 L.R.R.M. (BNA) 3176, 3178–79 (N.D.Cal.1977). The representations relevant to the estoppel theory must be made by someone with authority or apparent authority to bind the Fund. We agree with the position articulated in *Chambless,* 772 F.2d at 1041, where the court stated:

We have held that because "[t]he actuarial soundness of pension funds is, absent extraordinary circumstances, too important to permit trustees to obligate the fund to pay pensions to persons not entitled to them under the express terms of the pension plan," *Phillips v. Kennedy,* 542 F.2d 52, 55 n. 8 (8th Cir.1976) (quoted in *Haeberle v. Board of Trustees of Buffalo Carpenters Health–Care Funds,* 624 F.2d 1132, 1139 (2d Cir.1980)), "courts have been reluctant to apply the estoppel doctrine to require the payment of pension funds." *Haeberle,* 624 F.2d at 1139. As the district court stated herein, "[i]f such funds are too vital to allow plan trustees to obligate the fund

---

5. By stipulation of the parties, the Fund's actuarial soundness is not in issue. We note, however, that pension fund stability is a major concern in cases like the present one, given the strong policy in ERISA of protecting plan funds for the sake of employee-participants.

6. Appellants never state whether such positions were in fact available—a proposition that seems unlikely in the context of a contracting industry. This factual gap, however, is not determinative of this action, because as the district court supportably found, appellants' reliance was unwarranted in this case.

through their representations, a *fortiori* union officials—who are not as clearly identified with pension funds as are trustees—should not be permitted to commit the funds to persons not entitled to them." *Chambless v. Masters, Mates & Pilots Pension Plan,* 571 F.Supp. 1430, 1452 (S.D.N.Y.1983); *see Galvez v. Local 804 Welfare Trust Fund,* 543 F.Supp. 316, 318 (E.D.N.Y.1982).

■ Even assuming the former administrator recommended that course of action, it is difficult to see how the administrator could bind the Fund to a disbursement contrary to written fund rules. The case that comes closest to the facts before us is *Thurber v. Western Conference of Teamsters Pension Plan,* 542 F.2d 1106 (9th Cir.1976), where an employee of the firm retained to administer the pension fund induced a beneficiary to contribute personally to the fund and later to renounce all interest in his firm, forego retirement benefits, and remain unemployed, relying on his entitlement to pension benefits. Focusing on the written agreement requirements of 29 U.S.C. § 186 (1982 & Supp. I 1986) (*cf.* analogous requirement in ERISA, at 29 U.S.C. § 1102(a)(1) (1982)), the court determined that it would have been unlawful for the pension fund to pay the contested benefits and refused to apply the estoppel doctrine to compel an illegal act. "The rights of other pensioners must be considered, and the trust fund may not be deflated because of the misrepresentation or misconduct of the Administrator of the fund." *Id.* at 1109. *Cf. Phillips v. Kennedy,* 542 F.2d at 55 (court declines to apply estoppel doctrine in context of statements made by union officials and fund trustee).

We similarly reject appellants' attempt to rely on the representations made by the Fund administrator here. These representations were "informal" and clearly against Fund rules. Indeed, the administrator characterized them as "off-the-record" comments when made. We therefore hold that they were not binding on the Fund. Reliance on the ability to circumvent Fund rules in these circumstances amounted to no more than a gamble—a gamble which appellants lost.

■ The acts of the Fund present a different problem. The Fund accepted contributions on appellants' behalf, confirmed appellant Cleary's expectations in writing to a limited extent, and disbursed supplemental benefits to other participants who were as eligible or ineligible as appellants. The Eighth Circuit has stated that accepting contributions may impose upon trustees the duty to verify eligibility. The court in *Phillips, supra,* stated in dictum:

> We do emphasize, however, that it is the duty of the trustees to verify on a regular basis the eligibility of those for whom contributions are being made. The breach of that duty might well expose the trustees to personal liability in an appropriate case.
>
> While the receipt and acceptance by the trustees of contributions to the pension fund on Phillips' behalf does not create an estoppel in his favor, it can be considered with all other evidence in determining whether he was a unit employee.

542 F.2d at 55 n. 8. First, we note that the *Phillips* court limited the reference to the duty to verify to the issue of personal liability of the trustees, not to entitlement to fund benefits. Secondly, the court in *Phillips* was facing a situation tinged with the suggestion of bad faith or improper reasons to act on the part of the trustees. *Id.* (There was no evidence upon which trustees could have determined that Phillips was not entitled to his pension; there was some evidence that trustees may have denied pension benefits because Phillips withdrew from union). There is no indication that any similar circumstances are present in this case.

The *Phillips* court also stated that receipt and acceptance of contributions could be considered with all the other evidence in determining a participant's eligibility. As further explained by the court in *Chamberlin,* 99 L.R.R.M. (BNA) at 3179, the Fund's acceptance of contributions is relevant to the reasonableness of plaintiffs' reliance. We note that the Fund has on record over 100,000 individuals who have been partici-

pants in the Fund since 1967. Over 2,500 employers have sent contributions since that time. Currently, some 1,400 employers remit contributions on a regular monthly basis. The court below did not err in finding that the Fund was not estopped from denying supplementary benefits in these circumstances, because any reliance based on the mere fact of acceptance of contributions was not reasonable.

When appellant Cleary wrote to ascertain the amount he would receive as supplemental benefits, he received both an estimate and a letter certifying that he was eligible to receive supplemental benefits. Whereas these acts meant to appellants that their work for the union as part-time employees had saved their eligibility for supplemental benefits, from the Fund's perspective they meant only that contributions were being made on Cleary's behalf. Under these circumstances we cannot find fault with the Fund's conduct. The Fund's representations were accurate in light of the facts known by the administrator and trustees at the time they were made.

Similarly, the fact that the Fund began to disburse supplemental benefits to persons who had done part-time work for local unions is insufficient to require a finding of estoppel against the Fund. We do not believe such disbursements properly may be termed "representations" of the Fund that part-time work for a local union would satisfy Fund requirements. The payments were made by mistake because the Fund had not yet discovered that the employees receiving them were, in fact, ineligible under Fund rules. Although possibly giving the wrong impression to appellants, we do not believe the Fund may be deemed, by making mistaken payments, to have *represented* to appellants that the Fund also would err on their behalf.

Whereas appellants' case presents a moving set of circumstances—that of employees who are casualties of a contracting industry—we find that the district court did not err in holding that the fund was not estopped from denying supplemental benefits to appellants who relied on acts and representations that clearly contradicted the written rules of the Fund.[7]

## II. *Discriminatory Acts*

■ Appellants' second line of argument challenges the Trustees' decisions as arbitrary and capricious insofar as they discriminated against two artificial classes of potential beneficiaries. First, appellants contend that it was arbitrary and capricious to deny them supplemental benefits and continue payments to those beneficiaries who were already receiving them after maintaining their eligibility by working on a part-time basis for local unions. Secondly, appellants find discriminatory conduct in the retroactive liberalization of the rules, which expanded the reach of the rules to allow some but not all potential participants to receive supplemental benefits. Both arguments hinge on the same issue: if the trustees can "bend the rules" to benefit some, is it arbitrary and capricious not to extend the benefits to all similarly situated? We will therefore discuss these arguments jointly.

We begin by repeating oft-quoted language: In judging the actions taken by trustees in the course of managing an employment benefit plan, our inquiry is limited to determining whether the actions were arbitrary and capricious in light of the trustees' responsibility to all potential beneficiaries. *See Govoni v. Bricklayers, Masons & Plasterers Int'l Union of America, Local No. 5 Pension Fund,* 732 F.2d 250 (1st Cir.1984); *Palino v. Casey,* 664 F.2d 854, 858 (1st Cir.1981). Furthermore, trustees are allowed broad discretion in establishing and modifying eligibility rules. *Palino,* 664 F.2d at 858.

The trustees realized late in 1984 that a practice contrary to Fund rules was widely in use. They also realized that in enforcing the rules, several participants who were close to retirement age would not be eligible for supplemental benefits. The Board

7. Our conclusion on estoppel should lead to no inference on appellants' possible causes of action against the individual parties responsible for the misleading representations. *See Phillips,* 542 F.2d at 55 n. 8; *Thurber,* 542 F.2d at 1109 nn. 4 & 5.

realized its potential liability to Fund participants if they continued disbursing funds to persons who were not entitled to benefits under Fund rules. Furthermore, they weighed the Fund's exposure to successful lawsuits and concluded that beneficiaries who were already receiving benefits would present a greater risk than those who were not yet receiving benefits. In order to limit Fund liability while at the same time lessening the possible harsh effect of enforcing the rule, the trustees made a rational, reasonable decision.

Choosing the date of February 1984, as opposed to any other date, reflects the contingency of (1) the year in which the practice was discovered and (2) the month in which amendments have traditionally been effective. Drawing a line to define the extent of the remedial action is clearly within the discretion of the trustees.

Appellants rely on *Elser v. I.A.M. Nat'l Pension Fund,* 684 F.2d 648 (9th Cir.1982), *reh'g denied, cert. denied,* 464 U.S. 813, 104 S.Ct. 67, 78 L.Ed.2d 82 (1983), for the proposition that a Fund must offer a principled justification for denying benefits to one group and allowing them to another. In *Elser* the court faced plan cancellation provisions which had the skewed result of denying pensions to a group by the same requirement which would give pensions to another group that had worked a substantially lesser period of time for a contributing employer. *Id.* at 656. In the case before us the Fund is not depriving appellants of benefits to which they were entitled; it is merely enforcing the Fund rules as mandated by the statute and the rules themselves.

> The court's affirmative participation should be limited to "those cases where the eligibility requirements are so patently arbitrary and unreasonable as to lack foundation in factual basis and/or authority in governing case or statute law."

*Id.* at 655–56, (citing *Roark v. Lewis,* 401 F.2d 425, 429 (D.C.Cir.1968)). Appellants' claimed entitlement was clearly against the applicable authority, namely, the written provisions of the GCIU Fund. Therefore, *Elser* is inapposite both because the distinc-

tion between classes was not arbitrarily discriminatory and because they were not entitled under Fund rules to the claimed benefits.

Thus, we conclude that the district court did not err in rejecting appellants' promissory estoppel claim and in denying supplemental benefits to them. We further find that the Fund's determinations in allowing beneficiaries who were receiving supplemental benefits already to continue doing so, and in liberalizing eligibility rules in a limited way, were within the Trustees' discretionary powers, and were not arbitrary and capricious.

We therefore affirm the judgment.

*Affirmed.*